1

2

3
UNITED STATES DISTRICT COURT

4
NORTHERN DISTRICT OF CALIFORNIA

5
SAN JOSE DIVISION

6

7
SYNOPSYS, INC.,

Case No.   20-cv-02819-EJD

8
Plaintiff,

**ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND DAUBERTS**

9
v.

10
REAL INTENT, INC.,

Re: ECF Nos. 258, 261, 264, 267, 269, 273, 275, 297, 438

11
Defendant.

**REDACTED PUBLIC VERSION**

12

13
     Plaintiff Synopsys, Inc. moves for partial summary judgment its breach of contract and

14
Defendant Real Intent, Inc.'s fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth,

15
thirteenth, fourteenth, seventeenth, and twenty-third affirmative defenses.  Synopsys Motion for

16
Partial Summary Judgment ("Synopsys MSJ"), ECF No. 273.  Synopsys also moves to exclude the

17
opinions of Real Intent's experts Mr. Bradley Howe (ECF No. 264 ("Howe Mot.")), Dr. Brad

18
Quinton (ECF No. 267 ("Quinton Mot.")), Ms. Melissa Bennis (ECF No. 269 ("Bennis Mot.")),

19
and Dr. Marc Levitt (ECF No. 275 ("Levitt Mot.")).

20
     Real Intent moves for partial summary judgment on its fair use copyright defense,

21
Synopsys' copyright claim (including its compilation copyright claim), Synopsys' breach of

22
contract claim, and Synopsys' breach of implied covenant claim.  Real Intent Motion for Partial

23
Summary Judgment ("RI MSJ"), ECF No. 297.  Real Intent also moves to exclude the opinions of

24
Synopsys' experts Dr. Majid Sarrafzadeh (ECF No. 258 ("Sarrafzadeh Mot.")) and Dr. Stephen

25
Edwards (ECF No. 261 ("Edwards Mot.")).

26
     The Court heard oral argument on the motions for partial summary judgment on May 16,

27

28

2024, and took the *Daubert* motions under submission pursuant to Civil Local Rule 7-1(b).

## BACKGROUND

Synopsys and Real Intent sell software tools to integrated circuit ("IC") designers in the EDA industry.  *See* ECF No. 145, Second Amended Complaint ("SAC") ¶ 1; ECF No. 151, Answer ¶ 7.  These software tools, which automate the process of creating and testing computer chip designs, are called "EDA tools."  Real Intent's Separate Statement in Support of Its Motion for Partial Summary Judgment ("RI SSUF"), ECF No. 361-3 at Fact 1.  The process IC designers follow to create and test a chip design before it is manufactured is called the chip "design flow," which consists of multiple steps, and for each step, an IC designer can use an EDA tool that is specific to that step of the design flow.  RI SSUF 2.  Some tools are used throughout the design flow.  Each of the EDA tools at issue has a command line interface ("CLI") and a set of input formats used to receive input from the user through the CLI.  The input formats for the tools at issue here consist of a set of commands, options to commands, parameters (or variables), objects and attributes.  Synopsys asserts that the name and associated syntax of its commands, variables, and attributes are original and protected by copyright.

Founded in 1986, Synopsys is a publicly traded company offering a wide breadth of many EDA tools to IC designers covering each stage of the design flow.  *See* RI SSUF 7.  Real Intent is a 50-person, private EDA company that, since 2010, has focused on developing innovative and specialized EDA tools within a segment of the EDA industry called "static verification." RI SSUF 13.  "CDC verification" is part of the "static verification" stage of the design flow.  CDC verification describes the process of testing a chip design for errors that may occur when data crosses between different portions of the chip that are run by different clocks (each such area is called a "clock domain").  RI SSUF 15.  Real Intent's Meridian CDC tool is a CDC-verification EDA tool that was released in 2010.  Real Intent also develops other types of EDA tools, including a tool called Ascent Lint, which performs a chip-design testing function called "linting sign-off." RI SSUF 16.

United States District Court
Northern District of California

1    Synopsys used Real Intent's Meridian CDC tool from 2011 to 2015, and the parties entered

2    into several license agreements.  RI SSUF 79.  At the time, another company (Atrenta) also had a

3    CDC-verification tool called "SpyGlass."  *See* RI SSUF 77.  Real Intent and Synopsys dispute

4    whether the two companies (Real Intent and Atrenta) were the only two major competitors in the

5    CDC-verification.  RI SSUF 77.

6    In 2015, Synopsys purchased Atrenta and acquired the SpyGlass EDA tool suite.

7    In 2020, Synopsys sued Real Intent, accusing Real Intent's Meridian and Ascent tools of

8    infringing Synopsys' copyrights.  Complaint, ECF No. 1.  Real Intent's Meridian and Ascent EDA

9    tools have a user interface that allows IC designers to (1) manually type and enter individual

10   "commands" directly into a CLI to communicate instructions to the software; and (2) load a

11   "script," containing a list of commands, that the software will read and execute sequentially on a

12   line-by-line basis.  Synopsys takes issue with Real Intents use of certain commands, options, and

13   object-attribute pairings from Synopsys' copyrighted works.  Synopsys does not accuse Real

14   Intent of copying any source code.

15   Synopsys' copyright infringement claim is based on 20 copyright registered works.  The

16   copyright registrations cover five Synopsys products: six versions of Design Compiler, five

17   versions of IC Compiler, one version of IC Compiler II, six versions of PrimeTime, and two

18   versions of VC SpyGlass.  RI SSUF 8.  Synopsys alleges that one or more of the disputed

19   commands are present in the user documentation for these twenty asserted works.

20   Synopsys brings other claims against Real Intent, including for breach of contract, breach

21   of implied covenant of good faith and fair dealing, and patent infringement of U.S. Patent No.

22   9,721,057 ("the '057 Patent").

23                              **LEGAL STANDARD**

24   **I.      MOTIONS TO EXCLUDE EXPERTS**

25   Courts act as gatekeepers of expert testimony to ensure that such testimony is reliable and

26   relevant under Federal Rule of Evidence 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147

1    (1999); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The proponent of

2    expert testimony has the burden of proving admissibility. *In re Korean Ramen Antitrust Litig.*,

3    281 F. Supp. 3d 892, 931 (N.D. Cal. 2017) (citations omitted). Before an expert can offer his or

4    her opinions, they must be qualified by "knowledge, skill, experience, training, or education."

5    Fed. R. Evid. 702. Once he or she is qualified, Rule 702 permits her to testify as long as "(a) the

6    expert's scientific, technical, or other specialized knowledge will help the trier of fact to

7    understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

8    facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert

9    has reliably applied the principles and methods to the facts of the case." *Id.* This multifactor

10   inquiry is flexible, and "Rule 702 should be applied with a 'liberal thrust' favoring admission."

11   *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations omitted).

## II.    MOTIONS FOR SUMMARY JUDGMENT

13   Summary judgment on a claim or defense is appropriate "if the movant shows that there is

14   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

15   law." Fed. R. Civ. Proc. 56(a). To prevail, a party moving for summary judgment must show the

16   absence of a genuine issue of material fact with respect to an essential element of the non-moving

17   party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at

18   trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this

19   showing, the burden then shifts to the party opposing summary judgment to identify "specific facts

20   showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then

21   present affirmative evidence from which a jury could return a verdict in that party's favor.

22   *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986). On summary judgment, the court draws all

23   reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for

24   summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing

25   of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However,

26   conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to

United States District Court
Northern District of California

defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). "If the nonmovant bears the burden of persuasion on the ultimate issue, the movant may make its required initial showing that there is no genuine dispute of material fact by demonstrating that 'there is an absence of evidence to support the non-moving party's case.'" *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897–98 (9th Cir. 2021) (first citing Fed. R. Civ. Proc. 56(c)(1)(A); and then quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). "The burden of production then shifts to the nonmovant, who must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted) (quoting *Celotex Corp.*, 477 U.S. at 324). "The nonmovant's burden of production at this point is not a light one—it must show more than the mere existence of a scintilla of evidence or some metaphysical doubt as to the material facts at issue." *Id.* (quotations omitted). The nonmoving party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor," assuming that "all justifiable inferences are . . . drawn in its favor." *Id.* (quoting *Oracle Sec. Litig.*, 627 F.3d at 387).

## DISCUSSION

Because the Court grants summary judgment in favor of Real Intent on fair use (*see infra* Part V(B)), certain *Daubert* issues are moot. To the extent a *Daubert* motion or issue is moot, the Court will so indicate below.

## III.   SYNOPSYS' MOTIONS TO EXCLUDE

Synopsys moves to exclude the expert opinions of four of Real Intent's experts:  Mr. Howe (ECF No. 264), Dr. Quinton (ECF No. 267), Ms. Bennis (ECF No. 269), and Dr. Levitt (ECF No. 275).

### A.   Bradley Howe

Mr. Howe submitted opinions related to Real Intent's scènes à faire and fair use

affirmative defenses.  Expert Report of Bradley Howe ("Howe Rep."), ECF No. 263-5.  According to Synopsys, Mr. Howe's opinions should be excluded because he applied an incorrect legal standard and because his opinions lack factual basis and are not supported by any expert analysis. Synopsys also contends that Mr. Howe lacks the required expertise required to opine on scènes à faire and fair use.

Synopsys' challenges to Mr. Howe's scènes à faire opinion are moot following the Court's fair use ruling.  The Court addresses Synopsys' arguments related to Mr. Howe's fair use opinion below.

### 1.    Whether Mr. Howe Applied the Correct Legal Standard

Synopsys argues that Mr. Howe's opinion that Real Intent's copying "advances interoperability" is irrelevant to any fair use factor and "inconsistent with the law."  Howe Mot. 7–8 (citing Howe Rep. ¶¶ 26, 100; Deposition of Bradley Howe ("Howe Tr.") 138:25–140:2).

The Court declines to exclude Mr. Howe's fair use opinion.  Mr. Howe opines, based on his understanding of the relevant factors bearing on fair use and "based on years of experience as a chip designer in the EDA industry," that "Real Intent's use of the asserted command set elements advances interoperability between Synopsys' EDA tools and Real Intent's tools, which weighs in favor of a finding of fair use."  Howe Rep. ¶ 100.  He proceeds to explain that interoperability refers to "the ability of EDA tools to correctly and effectively operate with another," and details how chip designers use EDA tools and their expectations.  *See id.* ¶¶ 101–11.  Even though "interoperability" is not one of the four primary factors courts use to evaluate fair use, those factors are "not exhaustive," and Mr. Howe's opinion is still relevant and not legally incorrect. *See Google LLC v. Oracle Am., Inc.* ("*Google*"), 593 U.S. 1, 19 (2021) (courts applying fair use "have understood that the provision's list of factors is not exhaustive (note the words 'include' and 'including'), that the examples it sets forth do not exclude other examples (note the words 'such as'), and that some factors may prove more important in some contexts than in others"). Mr. Howe discusses how, in his view, chip designers "expect their familiarity" with Synopsys'

EDA tools to apply to other types of EDA tools.  Howe Rep. ¶ 108.  This may be relevant at least to the "purpose and character of the use" factor.  *See Google*, 593 U.S. at 30 (considering copying in context of programmers' familiarity with programming language under "purpose and character of use" factor).  Synopsys argues that "the question here is not whether Real Intent believes the facts are similar to *Google*; the question is whether Mr. Howe's actual opinion applied the correct legal standard."  Howe Reply 5.  The Court agrees and finds that, regardless of the applicability *Google* has on this case, Mr. Howe's opinion applies the correct legal standard.  Synopsys identifies no authority suggesting that experts may only opine on one or all of the *primary* fair use factors.  Given that the list of factors is not exhaustive, Mr. Howe's opinion did not apply an incorrect legal standard.

The Court finds unpersuasive Synopsys' argument that Mr. Howe's opinion is "so simplistic and broad" that it is contrary to law.  Howe Reply 6.  He does not opine, as Synopsys suggests, that any copying advances interoperability and "so any copying is fair use."  *Id.*  He opines that any copying advances interoperability, "which weighs in favor of a finding of fair use."  Howe Rep. ¶ 100.  As explained above, courts may consider factors beyond the four primary factors, and Real Intent may choose to argue that interoperability weighs in favor of fair use.  Of course, Synopsys is free to challenge that argument, and Real Intent's reliance on Mr. Howe's opinion, at trial.

Accordingly, the Court declines to exclude Mr. Howe's fair use opinion.

### 2.      Whether Mr. Howe's Opinions Are Reliable

Even if Mr. Howe's opinions are relevant, Synopsys contends they would still be inadmissible because they are not reliable.  In support, Synopsys argues that Mr. Howe failed to evaluate the factual record and performed no analysis in forming his opinions.  Howe Mot. 8.  Synopsys argues that Mr. Howe's failure to review any Real Intent or Synopsys documents, deposition testimony, or Real Intent products renders his fair use and scènes à faire opinions unreliable.

United States District Court
Northern District of California

Real Intent responds that Mr. Howe's opinions are reliable because he formed them based on "relevant Synopsys documents and testimony, as well as his personal and extensive professional knowledge and experience in the EDA industry since 1985." Real Intent Opposition to Motion to Exclude Opinions of Bradley Howe ("Howe Opp."), ECF No. 311-4 at 15. In particular, Real Intent points out that Mr. Howe reviewed (1) Synopsys' interrogatory response which identified the list of accused commands, (2) Dr. Edwards' expert report which included a summary table identifying these commands, (3) several software manuals from third-party EDA companies and chip-design textbooks, (4) an internal Synopsys user-interface guideline, (5) a public Synopsys presentation, (6) the deposition transcript of a former Synopsys engineer, and (7) the same former Synopsys engineer's manuscript. Howe Opp. 15–17 (citing Howe Rep. ¶¶ 13, 52, 74, 93–99).

The Court finds that the materials reviewed combined with Mr. Howe's experience provide sufficient foundation and basis to support his opinions. Real Intent may challenge the documents Mr. Howe considered, and any failure to consider other documents, during cross-examination.

The Court also declines to exclude Mr. Howe's opinions because he failed to perform any actual expert analysis to support those opinions. In forming his opinions, Mr. Howe drew from his knowledge and experience as a "user of EDA software since the mid-1980s." Howe Rep. ¶ 93. Synopsys argues that Mr. Howe simply compared words in various documents to formulate his opinion, which requires "no expertise." Howe Mot. 11. But Mr. Howe relied on his "experience designing chips since 1985" and his prior experience with "various commands on CLIs that employ a verb-noun format" to opine, for example, that "Synopsys did not originate this format for its commands." Howe Rep. ¶ 91. He also comments that "it is not surprising that many of the specific terms used in those command set elements" "were commonplace by the late 1980s" and "[a]s a user of EDA software since the mid-1980s, [he] recall[s] many command terms that form part of the commands asserted by Synopsys in this lawsuit." *Id.* ¶ 93.

The Court finds that Mr. Howe's opinions are sufficiently reliable.

### 3. Mr. Howe's Expertise

Finally, the Court finds declines to find that Mr. Howe is unqualified to offer a fair use opinion. Mr. Howe is "an independent technology consultant with over 35 years of experience in engineering, management, and executive leadership in the semiconductor and software industries." Howe Rep. ¶ 4. He has "extensive experience in the areas of chip design and fabrication," and his "core expertise is in the areas of chip design, manufacturing, and tool support." *Id.* Synopsys argues that Mr. Howe's lack of experience *designing* EDA tools renders him unqualified to opine on (1) the choices made by Synopsys engineers about the command sets and whether they were constrained in making those choices, and (2) the purpose of Real Intent's engineers in copying from Synopsys. Howe Mot. 12.

The Court disagrees. Mr. Howe has the relevant expertise and experience as a longtime chip designer to opine on fair use. As to fair use and his opinions regarding interoperability, the Court finds Mr. Howe is qualified to testify about the familiarity of chip designers with the disputed command sets, based in part on his experience having designed chips for decades. As to Mr. Howe's testimony that he has not used EDA tools in over 25 years, Synopsys may examine this testimony on cross examination.

### B. Conclusion

For the foregoing reasons, Synopsys' motion to exclude the opinions of Mr. Howe is DENIED.

\* \* \*

### C. Dr. Brad Quinton

Dr. Quinton submitted a report on issues related to Synopsys' allegations of copyright infringement, breach of contract and the covenant of good faith and fair dealing, and misconduct related to DesignWare. Dr. Quinton's report also responds to Dr. Edwards' report regarding copyrightability. Expert Report of Dr. Brad Quinton ("Quinton Rep."), ECF No. 265-5. Synopsys moves for an order excluding the opinions of Dr. Quinton on several grounds. Some of Synopsys'

United States District Court
Northern District of California

1  challenges to Dr. Quinton's copyrightability opinions are moot in light of the Court's fair use

2  defense.  The Court addresses below Synopsys' arguments that have not been mooted.

3  **1.      Copyrightability and Scènes à Faire**

4  Command-Set Elements.  First, Synopsys argues that Dr. Quinton's copyrightability and

5  scènes à faire opinions should be excluded because he opines only on "command set elements"

6  that are different from the actual "elements" Synopsys asserts to be protected by copyright and

7  infringed by Real Intent.  Because these opinions may touch on fair use arguments, the Court

8  addresses Synopsys' challenge to the opinions below.

9  The asserted "command set elements" that Synopsys alleges Real Intent copied include the

10  *combination* of the names and associated syntax of the commands, variables and attributes—

11  Synopsys is not asserting that Real Intent infringes only the names or only the syntax of

12  commands, variables, and attributes.  Quinton Mot. 7.  Neither Real Intent nor Dr. Quinton

13  disputes this.  Quinton Rep. ¶ 530.  Because Dr. Quinton's "analysis of copyrightability treats each

14  individual command name, option name, attribute name, and object-attribute pairing as a separate

15  element, and syntax as a 'further element,'" Synopsys contends this is a flawed analysis and

16  therefore renders all of Dr. Quinton's copyrightability opinions irrelevant and unhelpful.  Quinton

17  Mot. 8.  At bottom, Synopsys argues that Dr. Quinton's copyrightability opinions fails to analyze

18  the actual material asserted.

19  Real Intent responds that Dr. Quinton properly opined on how the disputed elements are

20  named and the "unoriginal and conventional nature of their associated syntax."  Opposition to

21  Synopsys' Motion to Exclude Opinions of Brad Quinton ("Quinton Opp."), ECF No. 308-2 at 9.

22  Dr. Quinton's method of breaking the process into parts is supported by, Real Intent argues,

23  Synopsys' own documents and engineers which confirm that the command-sets comprise

24  (1) selecting a common term, followed by (2) conventional syntax rules.  *Id.*

25  The Court finds that Dr. Quinton appropriately responds to opinions in Dr. Edwards'

26  report.  Dr. Edwards opines that developers make "creative decisions" when creating a new

United States District Court
Northern District of California

1  command line interface, including decisions on "individual commands, options, variables, objects,

2  and attributes."  Expert Report of Dr. Stephen Edwards ("Edwards Rep."), ECF No. 318-5 ¶ 92.

3  Dr. Edwards, after explaining the creativity involved in selecting individual commands, their

4  associated options, as well as objects and their associated attributes (*id.* ¶¶ 88–92), opines that

5  Synopsys' command sets (*id.* ¶ 99) *and* the "the individual commands, options, variables, and

6  objects/attributes" (*id.* ¶ 101) are copyrightable.  The individual aspects, Dr. Edwards opines,

7  "also reflect many creative and expressive choices."  *Id.* ¶ 101.  In response, Dr. Quinton

8  challenges those opinions and posits, for example—contrary to Dr. Edwards' view—the use of

9  "square brackets" around command options or a "dash" were not creative decisions made by

10  Synopsys.  *Id.* ¶¶ 408–09.

11      Accordingly, the Court declines to exclude Dr. Quinton's opinions related to the command

12  set elements.  Synopsys' remaining arguments regarding Dr. Quinton's scènes à faire and

13  copyrightability opinions are moot in light of the Court's fair use finding.

14                      **2.      Knowledge of Copying**

15      Synopsys argues that Dr. Quinton's opinion on whether Synopsys knew of Real Intent's

16  copying should be excluded as an improper opinion on state of mind and an improper assessment

17  of witness credibility.  Quinton Mot. 17.  Dr. Quinton opines that, based on his review of

18  deposition testimony and materials and his experience using EDA tools, (1) Synopsys engineers

19  who were using Real Intent's Meridian CDC tool were aware of Real Intent's support of several of

20  the disputed command set elements; and (2) Synopsys engineers should have been aware of many

21  of the disputed command set elements supported by those tools during the 2011 through 2015 time

22  period.  Quinton Rep. ¶¶ 666–67.  Synopsys argues this amounts to improper speculation about the

23  knowledge and intent of Synopsys' engineers and an assessment of witness credibility.  Quinton

24  Mot. 18.

25      Real Intent responds that Dr. Edwards committed the same sin in his report, offering

26  several opinions about what Real Intent employees "knew."  Quinton Opp. 23 (citing Edwards

27

28  Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE

Rep. ¶¶ 142, 145, 148, 186, 187).  In acknowledging that "it is up to the factfinder to decide what a person or party 'knew' or the motives behind a decision," Real Intent agrees to withdraw the first two sentences of Paragraph 667 from Dr. Quinton's report if Synopsys withdraws similar statements from Dr. Edwards' report regarding what Real Intent knew.  Synopsys rejects this proposal.

In reviewing Dr. Edwards' report, the Court finds that Dr. Edwards offered opinions similar to those Synopsys seeks to exclude.  For instance, Synopsys complains that Dr. Quinton, relying on deposition testimony and documents, opined about what Synopsys engineers knew, but Dr. Edwards similarly discusses what Real Intent "employee[s] testified" about and what "contemporaneous development and other documents show" to opine regarding what Real Intent "knew" and "understood" regarding, for example, the "scope of the open-source SDC license." Edwards Rep. ¶¶ 142, 145–146.  Synopsys argues that, unlike Dr. Quinton, Dr. Edwards "is using his expertise to help parse technical jargon and source code," but Dr. Edwards still is opining on the credibility of Real Intent's witnesses whose testimony apparently conflicts with documentary evidence.

Neither expert will be permitted to opine regarding the state of mind of witnesses or assess witness credibility.

### 3.  DesignWare Files

Finally, Synopsys moves to exclude Dr. Quinton's opinions related to DesignWare—that Real Intent did not create equivalent, derivate, or "knock off" versions of DesignWare components or DesignWare simulation models—because he admitted in deposition to have only reviewed 10 of the 270 modified DesignWare filed in forming that opinion.  Quinton Mot. 19.  Real Intent responds that Dr. Quinton's DesignWare opinions are properly a direct rebuttal to Dr. Edwards' statements regarding the nature and purpose of the DesignWare modifications, and Dr. Quinton explains in his report why his representative sample was reasonable.  Quinton Opp. 24.

The Court finds that Dr. Quinton's DesignWare opinion is a proper rebuttal to Dr.

Edwards' statements and will not be excluded.  Synopsys can challenge Dr. Quinton's reliance on a "representative sample" at trial.

### D.    Conclusion

For the foregoing reasons, the Court rules as follows:

Dr. Quinton (and Dr. Edwards) will not be permitted to opine regarding the state of mind of witnesses or assess witness credibility.

Synopsys' motion to exclude the opinions of Dr. Quinton is otherwise DENIED.

* * *

### E.    Melissa A. Bennis

Ms. Bennis is Real Intent's damages expert.  Ms. Bennis submitted a rebuttal report to respond to opinions of Synopsys' damages expert, Brian W. Napper, and to opine on the appropriate amount of damages should Real Intent be found liable.  Rebuttal Expert Report and Disclosure of Melissa Bennis ("Bennis Rep."), ECF No. 384-4.  Synopsys moves for an order excluding certain testimony of Ms. Bennis based on several grounds.  Synopsys' arguments regarding Ms. Bennis' lost profits opinion on copyright and her disgorgement opinions are moot following the Court's ruling on fair use, and the Court will not address them.

#### 1.    Fair Use

Synopsys moves to exclude Ms. Bennis' fair use opinion because she fails to evaluate one of two considerations that inform the fourth fair use factor.  Ms. Bennis "focuses entirely" on the first: "the extent of market harm caused by the particular actions of the alleged infringer," and ignores the second: "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original and the market for derivative works."  Bennis Mot. 11–12 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994)).

Real Intent responds that Ms. Bennis did address the second consideration, but there is no basis to exclude her opinion even if she had not.  Opposition to Synopsys' Motion to Exclude

United States District Court
Northern District of California

1   Opinions of Melissa Bennis, ECF No. 315-2 at 24 (citing portions of Bennis Report that Real

2   Intent contends "bear on" the second consideration).

3        Based on Ms. Bennis' deposition testimony stating that her fair use analysis was limited to

4   "Real Intent's specific actions," it appears she did not consider the extent of harm to the market

5   and potential markets caused by unrestricted and widespread conduct caused by the accused

6   infringer.  However, the Court is not convinced that her opinion regarding the first consideration

7   should be excluded as a result.  She states in her report that she was asked to "offer *some opinions*

8   *relating to* the fourth factor, i.e., the effect of the use upon the potential market for or value of the

9   copyrighted work."  Bennis Rep. 81.  It was not improper for Ms. Bennis to "offer some opinions"

10  relating to the first consideration of the fourth fair use factor, and for Dr. Quinton to separately

11  opine on fair use.  *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 816 (9th Cir.

12  2014) ("Reliable expert testimony need only be relevant, and need not establish every element that

13  the plaintiff must prove, in order to be admissible") (quoting *Primiano v. Cook*, 598 F.3d 558, 565

14  (9th Cir. 2010), as amended (Apr. 27, 2010)).

### 2.    Lost Profits (Breach of Contract)

16       Finally, Synopsys moves to exclude Ms. Bennis' lost profit opinion on breach of contract

17  for resting on the same "burden of proof" assertion.  While Ms. Bennis appropriately criticizes

18  Mr. Napper's lost profits calculations, including his failure to account for other competitors that

19  could have achieved lost sales, his double-counting of revenues, and his failure to consider

20  Synopsys' higher prices, Ms. Bennis does inappropriately conclude that "Mr. Napper has not

21  adequately shown that Synopsys actually lost the business achieved by Real Intent as a result of

22  Real Intent's alleged breaches, and thus experienced any actual harm."  That sentence will be

23  stricken as an improper legal opinion.

### F.    Conclusion

25       For the foregoing reasons, the Court rules as follows:

26       Ms. Bennis will not be permitted to testify at trial regarding her conclusion that

United States District Court
Northern District of California

1   Mr. Napper or Synopsys failed to "meet its burden" or "prove" that Synopsys has lost profits.

2   The Court will strike the following sentence from Ms. Bennis' report:

3   • Page 88: "Mr. Napper has not adequately shown that Synopsys actually lost the

4   business achieved by Real Intent as a result of Real Intent's alleged breaches, and

5   thus experienced any actual harm."

6   Synopsys' motion to exclude the opinions of Ms. Bennis is otherwise DENIED.

7   **G.      Dr. Marc Levitt**

8   Dr. Levitt is Real Intent's technical expert on patent issues.  Dr. Levitt submitted an

9   opening report regarding the validity of the asserted claims of U.S. Patent No. 9,721,057 (the

10   "'057 Patent").  Opening Expert Report of Dr. Marc E. Levitt ("Levitt Rep.").  Synopsys moves

11   for an order excluding Dr. Levitt's (1) 35 U.S.C. § 101 opinions; (2) opinions regarding

12   motivations to combine and reasonable expectation of success; and (3) opinions regarding the

13   legal consequences of Synopsys's patent prosecution activities.  Each are addressed below.

14   **1.      35 U.S.C. § 101 Opinions**

15   Synopsys first moves to exclude Dr. Levitt's opinions regarding validity of the '057 Patent

16   under § 101 as set forth in paragraphs 29 and 1005–52 of his report because they are not based on

17   facts in the case, are not the product of reliable methodology and analysis, and fail to apply the

18   correct legal standard.  Levitt Mot. 5.

19   Dr. Levitt opines that the Asserted Claims[1] are invalid under § 101 as covering patent

20   ineligible subject matter.  In support of that opinion, and relevant to Synopsys' motion, Dr. Levitt

21   explains that the Asserted Claims "are directed to an idea that can be (and is) performed manually

22   by engineers on design teams."  Levitt Rep. ¶ 1022.  It is this opinion, that the claimed process can

23   be done "manually," that Synopsys takes issue with.  Synopsys argues, in essence, that

24   Dr. Levitt's answers at deposition confirm that the features recited in the Asserted Patents are

25   "rooted in computer technology" and a computer is needed to practice all steps.  And Synopsys

26

27   [1] The "Asserted Claims" are claims 1–4, 6–8, 10–12, 14–15, and 17–18 of the '057 Patent.
     Case No.: 20-cv-02819-EJD

28   ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
     TO EXCLUDE

United States District Court
Northern District of California

criticizes Dr. Levitt's opinion that *all* steps and limitations of the Asserted Claims of the Asserted Claims could be practiced by a human manually.  Levitt Mot. 6.

Real Intent responds that Dr. Levitt does not opine that all steps could be performed manually, nor is doing so required to prove invalidity under § 101.  Opposition to Motion to Exclude Opinions of Marc Levitt ("Levitt Opp."), ECF No. 307 at 13.

To determine whether the abstract idea exception under § 101 applies, the Supreme Court has set forth a two-step inquiry.  *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017).  A court must determine: (1) whether the claim is directed to a patent-ineligible concept, i.e., a law of nature, a natural phenomenon, or an abstract idea; and if so, (2) whether the elements of the claim, considered "both individually and 'as an ordered combination,'" add enough to "'transform the nature of the claim' into a patent-eligible application."  *Id.* (quoting *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014)).  Step one requires an evaluation of "the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter."  *Id.* (cleaned up).

The Court finds that Dr. Levitt's § 101 opinion should not be excluded.  The claimed advance over the prior art, Dr. Levitt opines, was "automating the use of a mapping file as part of the 'migrating' step of the claims."  Levitt Rep. ¶ 1018.  Dr. Levitt opines that "all of the Asserted Claims are directed to" the abstract idea of "automating the process of creating netlist-level CDC constraints from RTL-level CDC constraints, comparing RTL-level CDC circuit design verification results with netlist-level CDC verification results, and reporting the similarities and differences."  Levitt Rep. ¶ 1028.  These steps of "creating," "comparing," and "reporting," Dr. Levitt opines, were "all tasks that were done by chip designers well before the asserted priority date of the '057 patent, often by a manual process."  *Id.* (emphasis added).  In evaluating whether this claimed advance was directed to an abstract idea, Dr. Levitt noted that "chip designers were practicing the claimed concept manually, and in particular, were migrating constraints from the RTL-level to the netlist-level manually."  *Id.* ¶ 1025.  This opinion was based on the patent

abstract (*id.*), Mr. Litterick's 2006 DVCon presentation (*id.* ¶ 1026), and Dr. Levitt's personal experience performing design reviews (*id.* ¶ 1027).

Synopsys argues that Dr. Levitt provides no analysis to support his argument that the "checking" step can be performed manually.  Reply in Support of Motion to Exclude Opinions of Marc Levitt ("Levitt Reply"), ECF No. 347 at 5.  But Dr. Levitt opines that the checking step was well-known and already existed before the '057 Patent invention.  Levitt Rep. ¶ 1016.  The Court declines to find the lack of showing that the checking step can be performed manually, which Dr. Levitt opines was conventional, renders his section 101 opinion excludable.  To the extent Dr. Levitt testified inconsistently with his report or lacks support in the record showing that he (or any other engineer) has performed, or could perform, any of the claimed steps manually, Synopsys can cross-examine Dr. Levitt on those inconsistencies or shortcomings.

### 2.   Motivations to Combine and Reasonable Expectation of Success

Synopsys next argues that Dr. Levitt's opinions regarding motivation to combine prior art should be excluded as unhelpful to the trier of fact because the general opinions provide no analysis of any specific prior art reference or any specific alleged combination of references.  Synopsys seeks to exclude Dr. Levitt's opinions in the "Motivations to Combine" and "Additional Combinations with Chaturvedi, Rejouan, Baumgartner, and Siarkowski" sections of his report—paragraphs ¶¶ 328–43, 959, 967, 977, 987, and 998.  Real Intent responds that Dr. Levitt's obviousness analysis and opinions are proper because he provides an element-by-element analysis of each prior art reference combination and articulates a well-founded opinion on motivation to combine and reasonable expectation of success.  Levitt Opp. 17.

Turning to the "Motivation to Combine" section, Dr. Levitt opines that "all the Asserted Claims" are obvious under section 103 because "there were multiple circumstances that would have motivated a person of ordinary skill in the art to combine elements of the prior art."  Levitt Rep. ¶ 328.  "A skilled artisan would have been motivated to combine any of" the primary references with "any of" the secondary references.  *Id.* ¶ 333.  In this section, Dr. Levitt analyzes

1   the state of the relevant art and knowledge of a skilled artisan.  For example, he previews that the

2   secondary references generally disclose "algorithms that use RTL-level and netlist-level designs as

3   inputs and operate upon those design representations." *Id.*  Synopsys argues that certain

4   paragraphs in this section should be excluded as "untethered to any specific prior art reference or

5   specific combination of references."  Levitt Reply 8.  However, the Court finds that Dr. Levitt's

6   background analysis on the state of the art and knowledge of the skilled artisan is appropriate

7   context framing the rest of his motivation to combine opinions—including a section that Synopsys

8   does not challenge (Section X.B.1–4).

9          In the section titled "Additional Combinations with Chaturvedi, Rejouan, Baumgartner,

10  and Siarkowski" (*id.* ¶¶ 955–1004), Dr. Levitt presents additional combinations for the primary

11  references analyzed earlier in his report (with respect to Claim Elements [1.b], 3, [8.b], and [10.b]

12  and Claims 12 and 14) with additional references.  Synopsys complains that this section of the

13  report repeats verbatim the same two paragraphs to explain motivations to combine for the

14  "Additional Combinations."  The Court declines to exclude Dr. Levitt's opinions regarding

15  motivation to combine prior art in this section.  Although this section does not contain the same

16  level of detail provided in Section X.B.1–4, the opinions contained within it may still assist the

17  trier of fact.  The cases cited by Synopsys may stand for the general proposition that conclusory or

18  generalized obviousness opinions are unhelpful to the jury (*see* Levitt Mot. 13 (citing cases)), but

19  Dr. Levitt's opinions are meaningfully distinct because they identify which references could be

20  combined (the primary references with Morgan, Murphy, Siloti References, Ravi, or Cho) and

21  provide an articulated reason why a skilled artisan would find the claim elements obvious

22  considering the combination.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d

23  1312, 1328 (Fed. Cir. 2012); *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir.

24  2008), *Adasa Inc. v. Avery Dennison Corp.*, No. 17-cv-01685-MK, 2023 WL 3775332, *7-8 (D.

25  Or. June 2, 2023).  Dr. Levitt's copy-and-pasted paragraphs may be less compelling to a

26  factfinder, but they are neither legally erroneous nor unreliable.

27

28  Case No.: 20-cv-02819-EJD
    ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
    TO EXCLUDE

United States District Court
Northern District of California

1

### 3. Patent Prosecution Activities

Finally, Synopsys argues that Dr. Levitt's opinions regarding what Synopsys allegedly "did not contest" during patent prosecution should be excluded as irrelevant and improper legal opinions. Levitt Mot. 14. Synopsys also argues Dr. Levitt's opinions on this point contradicts Federal Circuit law governing the lack of consequence when a patent applicant is silent on a specific issue during prosecution. *Id.*

Dr. Levitt opines that the Asserted Claims are anticipated by a prior art reference, "Baumgartner," that the patent examiner considered, and which Synopsys overcame, during prosecution. Dr. Levitt opines that Synopsys' "failure to contest the Examiner's finding that Baumgartner anticipates what is now Claim Element [1.pre]" … "further supports" Dr. Levitt's opinion that Baumgartner discloses that element. Levitt Rep. ¶ 650.

The Court finds that Dr. Levitt's statements that Synopsys's "failure to contest" the examiner's findings during prosecution "supports" his opinion on invalidity amount to inadmissible legal opinions from a technical expert. Real Intent argues that Dr. Levitt is simply summarizing facts regarding what occurred during prosecution and relying on these facts to support his invalidity opinions. Levitt Opp. 21. However, there is a difference between Dr. Levitt summarizing the factual prosecution history (relevant and permissible) and opining that Synopsys's decision not to contest the examiner's finding supports his opinion in invalidity (impermissible legal opinion). Even if Dr. Levitt does not explicitly ascribe any legal meaning to Synopsys's silence during prosecution, his opinion that the silence "supports" his opinion implicitly suggests that doing so had adverse legal consequences. *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373–74 (Fed. Cir. 2003) ("An applicant's silence in response to an examiner's characterization of a claim does not reflect the applicant's clear and unmistakable acquiescence to that characterization if the claim is eventually allowed on grounds unrelated to the examiner's unrebutted characterization").

Accordingly, paragraphs 650, 667, 693, 706, 716, 727, 741, 758, and 770 will be excluded.

United States District Court
Northern District of California

**H.     Conclusion**

For the foregoing reasons, the Court rules as follows:

Paragraphs 650, 667, 693, 706, 716, 727, 741, 758, and 770 will be excluded.  Synopsys's

motion to exclude Dr. Levitt's opinions is otherwise DENIED.

* * *

## IV.     REAL INTENT'S MOTIONS TO EXCLUDE

Real Intent moves to exclude Synopsys' experts, Dr. Sarrafzadeh (ECF No. 258) and

Dr. Edwards (ECF No. 261).  The Court addresses each motion in turn below.

**A.     Majid Sarrafzadeh**

Dr. Majid Sarrafzadeh provided expert opinions on behalf of Synopsys regarding Real

Intent's alleged infringement of the asserted claims of the '057 Patent.  Expert Report of Majid

Sarrafzadeh ("Sarrafzadeh Rep.").  Real Intent's motion focuses on two terms in the '057 Patent

the Court construed in its claim construction order: "RTL-level CDC constraints" and "netlist

CDC constraints."  The Court construed those terms as follows:

| Claim Terms | Court's Construction |
|---|---|
| RTL-level CDC constraints | one or more limits on parameter values for a clock signal identified by its RTL-level name |
| netlist CDC constraints | one or more limits on parameter values for a clock signal identified by its gate-level netlist name |

Claim Construction Order 14–16, ECF No. 171.

Real Intent has moved to exclude testimony and opinions from Dr. Sarrafzadeh regarding

those two claim terms because his opinions are based on an interpretation that is different from,

and much broader than, the Court's claim constructions for those terms.  As to "RTL-level CDC

constraints," Real Intent provides the example that Dr. Sarrafzadeh opines that the accused Real

Intent PCDC product meets the "receiving . . .RTL-level CDC constraints" claim limitation

because a Real Intent Whitepaper shows "Constraints" as in input to a tool called "Verix CDC."

Sarrafzadeh Mot. 4 (citing Sarrafzadeh Rep. ¶¶ 60, 49).  But Dr. Sarrafzadeh's report fails to

explain how the "Constraints" he relies on, as reflected in the Whitepaper, are "one or more limits

on parameter values for a clock signal identified by its RTL-level name"—consistent with the Court's construction. *Id.* And as to "netlist CDC constraints," Real Intent points to Dr. Sarrafzadeh's opinion that, relying on the same Whitepaper, the accused Real Intent PCDC product "migrat[es] . . . the RTL-level CDC constraints to netlist CDC constraints and stor[es] the migrated netlist CDC constraints in the data storage." *Id.* (citing Sarrafzadeh Rep. ¶¶ 64–65). Because Dr. Sarrafzadeh's opinion does not explain how the mapped gate-level constraints (what Dr. Sarrafzadeh accuses as being the "netlist CDC constraints") specify "one or more limits on parameter values for a clock signal identified by its gate-level netlist name" (the Court's construction), Real Intent argues his opinion improperly broadens the scope of the claim term. *Id.* at 5.

Real Intent attempts to underscore Dr. Sarrafzadeh's incorrect application of the Court's claim construction by contrasting his opinions with those of Synopsys' validity expert, Dr. Barin Taskin. Dr. Taskin opines that merely referencing the terms "constraints" in a prior art reference does not meet the Court' claim construction of "RTL-level CDC constraints," whereas Dr. Sarrafzadeh appears to argue the opposite. Sarrafzadeh Mot. 6–7.

Synopsys responds that Real Intent selectively focuses on only certain portions of Dr. Sarrafzadeh's report and omits other portions, including test cases ran by Dr. Sarrafzadeh, that show a correct application of the Court's construction of the terms. Opposition to Motion to Exclude Opinions of Majid Sarrafzadeh, ECF No. 323-4 at 1. Synopsys also points out that Real Intent did not raise any dispute about Dr. Sarrafzadeh's application of the Court's construction during expert discovery, and any attempt to exclude his opinions now is strategic.

The Court finds that Dr. Sarrafzadeh's challenged opinions that the accused PCDC product falls within the scope of the Court's construction of "RTL-level CDC constraints" and "netlist CDC constraints" are appropriate. Although Dr. Sarrafzadeh's opinion does not explicitly restate the Court's construction in his report beyond confirming that he "applied the Court's construction" in his analysis (Sarrafzadeh Rep. ¶ 13), failing to do so does not render his opinion improper.

United States District Court
Northern District of California

Dr. Sarrafzadeh relied on Real Intent documents and his own tests in formulating his opinion on infringement.  That said, the Court acknowledges Real Intent's concern that certain arguments in the opposition appear unsupported in Dr. Sarrafzadeh's report.  *See* Reply in Support of Motion to Exclude Opinions of Sarrafzadeh, ECF No. 355-4 at 5–7 (arguing, for example, that Dr. Sarrafzadeh opined that the "RTL CDC constraints" are read in using the read_env command on a different file than that identified in Synopsys' opposition brief).   Dr. Sarrafzadeh, like all experts in this case, will be limited to opinions set forth and supported in his report.  Limitations on Dr. Sarrafzadeh's testimony as it applies to opinions Real Intent argues are unsupported in the body of the report can be addressed in any motion in limine.

The Court will instruct the jurors on the correct interpretation of the claim terms, and the jury will determine if Synopsys has proven infringement based on those constructions.  Real Intent may challenge Dr. Sarrafzadeh's credibility and his opinions regarding whether the PCDC infringes the '057 Patent.  Real Intent's arguments regarding the apparent inconsistency between Dr. Sarrafzadeh's infringement opinions and Dr. Taskin's validity opinions can be used to challenge Dr. Sarrafzadeh's opinion at trial.  Similarly, Real Intent can raise its arguments that Dr. Sarrafzadeh's deposition testimony fails to support, and in fact undermines, his opinions based on the "rtl.env" file, at trial.

### B.   Conclusion

For the foregoing reasons, the Court DENIES Real Intent's motion to exclude the requested opinions and testimony of Dr. Sarrafzadeh with the caveats identified above.

\* \* \*

### C.   Stephen Edwards

Dr. Stephen Edwards, Synopsys' copyright expert, provided an opening report ("Edwards Opening Rep.") and a rebuttal report ("Edwards Rebuttal Rep.") in this case.  Dr. Edwards' opening report includes opinions that Real Intent copied portions of Synopsys' copyrighted command sets and product documentation into its own tools and product documentation.  He also

United States District Court
Northern District of California

opines that Real Intent's accused software products are "substantially similar" to Synopsys' asserted works.  Real Intent moves to exclude certain aspects of Dr. Edwards' report based on three main arguments: (1) Dr. Edwards' comparison methodology is unreliable and based on insufficient facts; (2) Dr. Edwards' methodology in combining 10 separately registered works into four made-for-litigation works for comparison purposes is unreliable; and (3) Dr. Edwards' methodology in comparing an undeposited Synopsys manual with a Real Intent manual is inadmissible.  Edwards Mot. 1–3.  Following the Court's fair use ruling, Real Intent's motion to exclude Dr. Edwards' opinions is moot.

<p style="text-align:center">* * *</p>

## V.     SYNOPSYS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Synopsys moves for summary judgment on count two for breach of contract and Real Intent's fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, seventeenth, and twenty-third affirmative defenses.  The Court addresses Synopsys' arguments regarding its breach of contract claim and Real Intent's fair use affirmative defense.  The arguments as to Real Intent's remaining affirmative defenses are moot in light of the Court's fair use finding.

### A.     Count II (Breach of Contract)

Synopsys contends that Real Intent copied into its software products the proprietary command sets from Synopsys' competing products, including material that was obtained by Real Intent after it signed license agreements with Synopsys.  Synopsys MSJ 1.  Real Intent signed five license agreements[2] with Synopsys which included a prohibition on "incorporating" any part of the licensed products into Real Intent's products, and a prohibition on using the license products for "competitive purposes."  *Id.*  Synopsys argues that Real Intent (1) used at least one of the licensed products, Design Vision, in violation of these prohibitions, and (2) obtained and

---

[2] The parties entered into the 2013, 2014, 2015, and 2016 in-Sync Agreements (ECF Nos. 272-13–272-16 (the "in-Sync Agreements")) and the 2017 Synopsys Loan Agreement (ECF No. 272-17 (the "Loan Agreement")) (collectively, the "Agreements").

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

<div style="writing-mode: vertical-rl">United States District Court<br>Northern District of California</div>

distributed files from unlicensed copies of Synopsys' DesignWare Foundation Library in breach of its license agreements. *Id.* at 1–2.

The elements of a claim for breach of contract are: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *eOnline Glob., Inc. v. Google LLC*, 387 F. Supp. 3d 980, 985 (N.D. Cal. 2019) (quoting *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011)).

### 1.    Preemption

Real Intent opposes Synopsys' request for summary judgment on the breach of contract claim—and separately seeks summary judgment in its favor on the same claim—on the grounds that the contract claim is preempted by the Copyright Act. *See* Real Intent's Opposition to Synopsys' Motion for Partial Summary Judgment ("RI Opp."), ECF No. 322.  The Court will address arguments raised in both parties' motions for summary judgment on this threshold issue first.

The Ninth Circuit has "adopted a two-part test to determine whether a state law claim is preempted by the Act." *Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 971 (9th Cir. 2024) (quoting *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006)).  First, courts decide whether the subject matter of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103.  *Id.* (quotations omitted).  Second, assuming it does, courts determine whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders.  *Id.* The Ninth Circuit has "long recognized that a contractually-based claim generally possesses the extra element necessary to remove it from the ambit of the Copyright Act's express preemption provision." *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 761 (9th Cir. 2015)

The Court declines to find that Synopsys' breach of contract claim is preempted as a matter of law.  Synopsys alleges Real Intent breached two different provisions of the Agreements in three ways: first, Real Intent's incorporation of Synopsys material into its products violated the

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

provision that Real Intent shall not ████████████████████████████████████

███████████████████████████████████████ Second, Real Intent's use of the

licensed products for competitive purposes allegedly breached the provision that provides Real

Intent shall not ████████████████████████████████████ And third, Real

Intent's access and use of the unlicensed DesignWare Library breached a provision of the

Agreements that prevented such access or use to the DesignWare Library.

The first step is satisfied because the subject matter of the breach of contract claim

involves Synopsys' copyrighted works. *See* Synopsys MSJ 1 (alleging Real Intent breached

contract by using Design Vision—the front-end of Synopsys' copyrighted work, Design

Compiler). As to the second step, Synopsys' breach of contract claim includes an "extra element"

that makes the right asserted qualitatively different from those protected under the Copyright Act.

*See Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005) ("Most courts have

held that the Copyright Act does *not* preempt the enforcement of contractual rights"). As in

*Altera*, the "right at issue is not the reproduction of the [copyrighted works] as [Real Intent]

argues, but is more appropriately characterized as the use of [the licensed products]" in violation

of the license agreements. *Id.* (declining to find breach of software licensing agreement claim

preempted). The license agreements here involved terms that Synopsys alleged were breached

beyond a mere agreement to abstain from reproducing or distributing its copyright-protected

material. For example, Synopsys alleges that Real Intent used Design Vision to understand and

model the behavior in Real Intent's tools. This allegation of breach implicates rights outside the

scope of the Copyright Act.

Real Intent does not address *Altera* but instead argues that "courts routinely find breach of

express contract claims preempted by the Copyright Act." Real Intent Reply in Support of MSJ

("RI Reply"), ECF No. 361-2 (citing *United Fabrics Int'l, Inc. v. J.C. Penney Corp.*, Inc., 2008

WL 11337642, at *3 (C.D. Cal. July 21, 2008); *Rumble, Inc. v. Daily Mail & Gen. Tr. PLC*, No.

1    CV 19-08420-CJC(EX), 2020 WL 2510652, at *4 (C.D. Cal. Feb. 12, 2020)).[3]  In *United Fabrics*,

2    the plaintiff brought a breach of contract claim alleging only that defendants agreed (1) not to

3    infringe the designs and (2) to have any products bearing the designs created through plaintiff.

4    2008 WL 11337642, at *6.  Because plaintiff alleged "the agreement was breached when

5    defendants reproduced the designs and sold them to their customers" and "*not* that defendants

6    breached the agreement by failing or refusing to compensate [plaintiff]," the court concluded the

7    breach of contract claim lacked an "extra element" to avoid preemption.  *Id.* at *6.  And in

8    *Rumble*, the plaintiff asserted contractual rights "which merely proscribe [defendant] from

9    violating [its] copyrights."  *Rumble*, 2020 WL 2510652, at *3.  The court dismissed the breach of

10   contract claim as preempted because the contractual term did "no more than promise not to

11   infringe on copyrighted works."  *Id.* at *4.

12        Unlike *United Fabrics* and *Rumble*, Synopsys has alleged breaches of the Agreements that

13   are outside the scope of the Copyright Act.  This is sufficient to avoid preemption.

### 2.    Breach of Contract Elements

15        Turning to the elements of breach of contract, the first two are undisputed.  The parties

16   entered into the 2013, 2014, 2015, and 2016 in-Sync Agreements and the 2017 Synopsys Loan

17   Agreement.  *See* Real Intent's Response to Synopsys' Moving Separate Statement ("RI Resp.

18   SSUF"), ECF No. 321-5, Facts 1–5.  Synopsys performed under the Agreements by providing

19   Real Intent with license keys and access to all licensed products.  *See id.* at 6.

---

[3] The Court is in receipt of Real Intent's Motion for Leave to File a Notice of Supplemental Authority in Support of its Motion for Partial Summary Judgment.  ECF No. 438.  Real Intent's supplemental authority, *Tremblay v. OpenAI*, No. 23-cv-03223-AMO (N.D. Cal. July 30, 2024), ECF No. 162.  In *Tremblay*, the court found that the Copyright Act preempted plaintiff's UCL claim where plaintiffs alleged that the unfair business practice was "using Plaintiff's Infringed Works to train ChatGPT without permission."  *Id.* at 4.  The court rejected plaintiffs' argument that the UCL claim was not preempted because it was also "based on the claim that Defendants have unfairly created a commercial product."  *Id.*  The court found that the "subject matter of the UCL claim involves OpenAI's unauthorized use and copying of Plaintiffs' copyrighted books."  *Id. Tremblay* does not change the Court's conclusion because it did not involve the enforcement of contractual rights, which the Ninth Circuit has found typically supplies the "extra element" required to avoid preemption.

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

United States District Court
Northern District of California

1

### a.     Breach

2        Regarding breach, Synopsys argues that Real Intent breached the Agreements in three

3    ways: (1) by copying commands and attributes, with syntax, from Design Vision into its own

4    products; (2) by using the Licensed Products for competitive purposes; and (3) by accessing and

5    using the unlicensed DesignWare Library.

6        <u>Breach No. 1</u>.  The Agreements each provide that Real Intent shall not ▓▓▓▓▓▓

7    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8    ▓▓▓▓▓▓▓▓▓   In-Sync Agreements § 3.2; Loan Agreement § 2.3.  It is undisputed that one

9    of the Licensed Products under each Agreement was Design Vision.  *See* in-Sync Agreements at

10   Ex. A; Loan Agreement at Schedule 1.

11       In support of its allegations regarding the first breach, Synopsys cites testimony from

12   current and former Real Intent employees.  For example, one stated that they would "reference"

13   "Design Vision" to "determine the correct syntax for the commands" that would then get

14   "incorporate[d] into the Real Intent products."  ECF No. 272-20 at 113:24–115:1.  Another

15   testified that Real Intent used Design Vision to "reconcile the command set."  ECF No. 272-21 at

16   127:13–21.  Real Intent also admitted in responses to Requests for Admission that during the term

17   of the License Agreements, it incorporated six commands into its products.  ECF No. 272-18;

18   Synopsys Moving Separate Statement ("Synopsys SSUF"), Fact Nos. 15–20, 28.

19        Real Intent responds that the same evidence shows that Real Intent used Design Vision to

20   "ensure interoperability" between Real Intent and Synopsys EDA tools.  *See* RI Opp. 14.  Because

21   developing and supporting interoperability between the parties' tools was the "express objective of

22   the contracts," Real Intent argues that its use was permitted.  *Id.* (citing *Mike Rose's Auto Body,*

23   *Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, No. 16-CV-01864-EMC, 2016 WL

24   5407898, at *5 (N.D. Cal. Sept. 28, 2016)).  The Court is not convinced.  The lone case Real

25   Intent cites evaluated whether a dispute came within the scope of an arbitration clause.  *Mike*

26   *Rose's Auto Body*, 2016 WL 5407898, at *5.  The court explained that, "[w]here there appear to be

27

28   Case No.: 20-cv-02819-EJD
     ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
     TO EXCLUDE

United States District Court
Northern District of California

specific, inconsistent portions, courts must look to the contract as a whole" and "[p]articular clauses of a contract are subordinate to its general intent."  *Id.*  The court did not consider whether a party's actions constituted a breach of the specific clauses of a contract in light of the "general intent" of the contract.  Here, Real Intent does not argue that the section of the Agreements prohibiting Real Intent from modifying, incorporating into or with other software, or creating a derivative work contain words "which are wholly inconsistent with" the License Agreements.  Additionally, even if the Agreements' purpose was to provide interoperability solutions for Synopsys' customers, both the in-Sync Agreements and the Loan Agreement defined the "rights and responsibilities of each party in achieving interoperability," such that Real Intent was required to comply with the restrictions Synopsys now contends were breached.  in-Sync Agreements § 2.1; *see also id.*, Loan Agreement at Schedule 1 § 2 (permitting Real Intent to use the Licensed Products "in accordance with Section 2").  Thus, even if Real Intent's use of the Licensed Products was to improve interoperability, it was still restricted from modifying, incorporating into or with other software, or creating a derivative work of any part of the Synopsys Licensed Products in that process.

Real Intent also responds that its witnesses testified that information on Synopsys' commands "could come from" a different source, such as customers who requested them or through internet searches.  R.I. Opp. 14.  The cited testimony from Sarath Kirihennedige regarding whether Real Intent employees would recommend a user-requested command and testimony that Real Intent employees "sometimes" "find information on the Google" does not show that the disputed elements came from Google or customers.  Nor does it deny that Real Intent employees were using Design Vision in the way that other Real Intent employees confirms.

Synopsys has met its burden to show Real Intent breached Section 3.2 of the in-Sync Agreements and Section 2.3 the 2017 Synopsys Loan Agreement by copying commands and attributes, with syntax, from Design Vision into its own products.

Breach No. 2.  The in-Sync Agreements state that Real Intent shall not "use the Synopsys

Licensed Products for competitive purposes," (in-Sync Agreements § 3.2), and the Loan

Agreement states that Real Intent shall not "use the Licensed Product to develop or enhance any

product that competes with a Licensed Product" (Loan Agreement § 2.3).

Synopsys contends that, because it has been a direct competitor of Real Intent since at least

2015, Real Intent breached these provisions by incorporating the disputed commands, options, and

object/attributes into its products from 2015.  It is undisputed that Real Intent has been a direct

competitor of Synopsys since 2015 with respect to Synopsys' Spyglass product.

Synopsys SSUF 26.

In support of its allegations of breach of these provisions, Synopsys points to testimony

from Ralph Marczynski that Real Intent would "reference[]" Synopsys documentation "to create

some implementation that best would match users' expectations" (ECF No. 272-32 at 79:21–25)

and that Real Intent "tried to match expectations of customers" so they could "have a similar

experience across variety of tools they're using" (*id.* at 93:17–23).  Synopsys also cites to

testimony from Vikas Sachdeva that Real Intent's decision regarding what a particular tool does is

"driven by what customer sometimes expects" and Real Intent's "goal is to enable customers [to]

do CDC verification with those files."  ECF No. 272-33 at 154:18–155:8.  And Daryl Kowalski

testified that Real Intent used Design Vision "to essentially understand how the commands were

interpreted" to "ma[ke] sure that [Real Intent's] tool would handle them the same way."  ECF No.

272-20 at 39:2–20; *see also id.* at 119:12–17 (how a command worked "in Design Vision" viewed

as "the correct or gold standard").

Real Intent responds that a reasonable fact finder could conclude that Real Intent's use of

Design Vision was for the permitted purpose of interoperability, rather than competition with

Synopsys products.  RI Opp. 15.  As explained above, the Agreements "defined the rights and

responsibilities of each party in achieving interoperability" such that Real Intent's use for

achieving interoperability needed to comply with the restrictions outlined in the Agreements,

including the restriction on using the Synopsys Licensed Products for competitive purposes.  That

United States District Court
Northern District of California

said, the Court agrees that a reasonable fact finder could determine, based on testimony from Real Intent employees, that Real Intent's use of Design Vision was for interoperability and not for competitive purposes. Testimony shows that Real Intent (a competitor of Synopsys since at least 2015) used Design Vision (a Licensed Product) to ensure its products would handle the commands in the "same way." This testimony could support Synopsys' position that Real Intent used Design Vision to compete with Synopsys, but it could also support Real Intent's position that Real Intent was seeking to ensure interoperability within the scope permitted by the Agreements.

Accordingly, Synopsys has not met its burden to show breach of Section 3.2 of the in-Sync Agreements and Section 2.3 the 2017 Synopsys Loan Agreement for using the Licensed Products for competitive purposes.

Breach No. 3. Synopsys' final theory of breach is based on Real Intent's purported access and use of the unlicensed DesignWare Library. The in-Sync Agreements state the following:



in-Sync Agreements § 5.1; *see also* Loan Agreement § 5.1.

Synopsys presents evidence that the installation package for Design Vision contained a copy of the DesignWare Foundation Library (ECF No. 272-34) and that the DesignWare Foundation Library was not a licensed product under any of the License Agreements (*see* in-Sync License Agreements; *see also* Loan Agreement at Schedule 1). Synopsys also cites testimony from multiple Real Intent employees that Real Intent accessed and used files within the DesignWare Foundation Library. *See, e.g.*, ECF No. 272-33 at 172:19–22 ("we internally ran DesignWare"); *see also* ECF No. 272-35 at 88:20–22, 89:2–14, 159:22–160:5 (discussing Real Intent's use of various "DW" or "DesignWare" files); ECF No. 272-36 (email chain discussing

1    modifications to DesignWare).

2          Real Intent argues that Synopsys fails to (1) identify which DesignWare files Real Intent

3    accessed or used, (2) prove that DesignWare constitutes an unlicensed product, and (3) identify

4    which provision of the License Agreements was breached.  RI Opp. 15–16.  These complaints do

5    not warrant denial of Synopsys' motion on this issue for failure of proof.  Synopsys has stated that

6    Real Intent's access and use of the DesignWare Library (*see* Synopsys SSUF 42 (conceding that

7    "DesignWare" is not listed as a Licensed Product)) violates Section 5.1 of all Agreements.  And

8    Synopsys' expert identifies the DesignWare files by name.  *See* Edwards Rep.

9           Accordingly, Synopsys has met its burden to show breach of Section 5.1 of the in-Sync

10   Agreements and the 2017 Synopsys Loan Agreement for accessing and using the DesignWare

11   Library.

12                              **b.      Damages**

13         The final element required to prove a breach of contract claim requires resulting damages

14   to the plaintiff.  Synopsys argues that Real Intent agreed in the in-Sync Agreements that

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████

17   ████████████████████████████   in-Sync Agreements § 16.7.  According to

18   Synopsys, the first two breaches identified above are material, so damage from those breaches is

19   established by Section 16.7.  Synopsys MSJ 13–14.  Synopsys also identifies testimony from Real

20   Intent's experts and documents recognizing that "a competitive advantage has been taken from

21   Synopsys."  *Id.* at 14.  And even if the only damage Synopsys suffered was "nominal damage,"

22   Synopsys argues this final breach of contract element would be satisfied for summary judgment in

23   its favor on this issue.  *Id.* at 14–15.

24         The Court finds that, although there may be a dispute over the extent Synopsys

25   experienced competitive harm, Synopsys has still met its burden with respect to the final element

26   required to prove a breach of contract.  The parties dispute whether nominal damages are

27

28   Case No.: 20-cv-02819-EJD
     ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
     TO EXCLUDE

1    sufficient to withstand summary judgment.  RI Opp. 17 (citing *Aguilera v. Pirelli Armstrong Tire*

2    *Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000)).  But a California appellate decision reaffirmed

3    authority holding that nominal damages are available for breach of contract and can support entry

4    of judgment in favor of a plaintiff who suffered "no appreciable harm."  In *Elation Sys., Inc. v.*

5    *Fenn Bridge LLC*, the court specifically stated that it "d[id] not find *Aguilera* [] persuasive."

6    71 Cal. App. 5th 958, 965–66 (2021) ("Nominal damages may be properly awarded for the

7    violation of a contractual right because 'failure to perform a contractual duty is, in itself, a legal

8    wrong that is fully distinct from the actual damages'"); *see also hiQ Labs, Inc. v. LinkedIn Corp.*,

9    639 F. Supp. 3d 944, 962 (N.D. Cal. 2022) ("nominal damages are available for breach of contract

10   and can support entry of judgment in favor of a plaintiff who suffered no appreciable harm").

11   Thus, at a minimum, nominal damages can satisfy the final element for Synopsys' breach of

12   contract claim.

13          Accordingly, Synopsys has established the final element required to prove its breach of

14   contract claim.

15                                              * * *

16          In sum, Synopsys has met its burden to show it is entitled to summary judgment as to its

17   contract claim for breach of (1) Section 3.2 of the in-Sync Agreements and Section 2.3 the 2017

18   Synopsys Loan Agreement which provides that Real Intent shall not "modify, incorporate into or

19   with other software, or create a derivative work of any part of the Synopsys Licensed Products;"

20   and (2) Section 5.1 of the in-Sync Agreements and the 2017 Synopsys Loan Agreement for

21   accessing and using the DesignWare Library.

22          Synopsys has not met its burden with respect to its contract claim for breach of Section 3.2

23   of the in-Sync Agreements, which provides that Real Intent shall not "use the Synopsys Licensed

24   Products for competitive purposes;" or Section 2.3 the 2017 Synopsys Loan Agreement, which

25   provides that Real Intent shall not "use the Licensed Product to develop or enhance any product

26   that competes with a Licensed Product."

27
     Case No.: 20-cv-02819-EJD
28   ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
     TO EXCLUDE

United States District Court
Northern District of California

## B.      Fourth Affirmative Defense (Fair Use)

The parties have cross-moved on Real Intent's fair-use defense.  A copyright holder cannot prevent another person from making a "fair use" of copyrighted material.  *Google*, 593 U.S. at 18 (citing 17 U.S.C. § 107).  The U.S. Supreme Court has described the "fair use" doctrine as an "equitable rule of reason" that "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Id.* This affirmative defense "presumes that unauthorized copying has occurred, and is instead aimed at whether the defendant's use was fair."  *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012).  Real Intent, as the defendant, bears the burden of proof to establish fair use.  *Id.*

In determining whether Real Intent's use of the copyrighted work was "fair," the Court considers the four factors outlined in § 107: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  These factors are "not exhaustive," and "some factors may prove more important in some contexts than in others."  *Google*, 593 U.S. 1, 19 (2021).

Fair use is a "mixed question of law and fact."  *Id.* at 24.  Though applying the test "primarily involves legal work," it requires "determination of subsidiary factual questions" about the copying or the marketplace.  *Id.*

### 1.      Factor 1: The purpose and character of the use

The first fair use factor considers two sub-factors: (1) whether the use was transformative, and (2) whether the use was commercial.  Commercial use weighs against finding fair use, while transformative use weighs in favor.  Courts consider whether the use "adds something new, with a further purpose or different character, altering" the copyrighted work "with new expression, meaning or message."  *Google*, 593 U.S. at 29.  "[T]ransformativeness is a matter of degree." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 529 (2023).  "[T]he

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

more transformative the new work, the less will be the significance of the other factors." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013) (quotations omitted).

In Synopsys' view, transformativeness under these facts is straightforward: Real Intent used the disputed command sets to replicate the same function from Synopsys' product in Real Intent's product. Real Intent, by contrast, argues that its use of the disputed user-interface elements is highly transformative, which outweighs any commerciality of the use, because Real Intent used the user-interface elements to facilitate inter-vendor interoperability with its new and innovative software tools. Real Intent wanted to build a new EDA tool that would allow chip designers to save time, and which would ultimately further innovation. Though both Real Intent and Synopsys sell EDA tools that directly compete now, Real Intent contends that, at the time it copied, its creation of the new CDC tool was transformative because Synopsys did not have a comparable product.

The Supreme Court's reasoning in *Google v. Oracle* on transformativeness is instructive—particularly given the similarities in technology at issue in both cases. There, Google was accused of infringing Oracle's copyright in Java SE, a computer platform that allowed developers to use the widely employed Java programming language to develop programs that could run on any computer, regardless of the underlying hardware. The Court explained that the Java API comprised "a vast library of prewritten code to carry out complex tasks" that programmers confront in the course of software development. *Id.* at 9. Programmers could call upon those prewritten building blocks to save time in writing programs. Google sought to create its own development platform for smartphones, and in doing so, it copied some code from Java's APIs so that programmers who were familiar with Java would be able to work with its new platform. *Id.*

The Supreme Court found that Google's copying was transformative. In reaching that conclusion, the Court considered that Google's use sought "to create new products" and "expand the use and usefulness of Android-based smartphones." *Id.* at 30. The "new products" incorporating the copied declaring code offered programmers a "highly creative and innovative

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

34

1    tool," and Google copied the API "only insofar as needed to include tasks that would be useful in

2    smart programs." *Id.* Google's copying enabled it to provide "a new collection of tasks operating

3    in a distinct and different computing environment." *Id.* at 31.

4          Here, evidence shows that the copied elements perform the same function in Real Intent's

5    product as they do in Synopsys' products. Synopsys MSJ 16. For example, Synopsys cites

6    testimony from Real Intent employees that they used Synopsys' product, Design Vision, to make

7    sure that Real Intent's tool would handle the commands in the "same way," and that Real Intent

8    "matched the syntax that was in Design Vision" to achieve the "same results." *Id.* But, in

9    recognizing the unique nature of computer programs, *Google* teaches that courts must "go further"

10   than simply considering whether the copying was verbatim and done for the "same reason" that

11   the copyright owner used the material. *Google*, 593 U.S. at 30. So even if Real Intent copied the

12   same elements to perform the same function in its product as Synopsys' product, that is not the

13   end of the inquiry.

14         *Google* teaches that using computer programs to achieve compatibility or to create a new

15   product can be a "further purpose" that is transformative. Real Intent presents evidence that the

16   command sets it is accused of copying were used to improve compatibility of the design

17   constraints format used by IC designers between different EDA tools in the design flow, and to

18   improve interoperability between its tools and Synopsys' tools. *See, e.g.*, Quinton Rep. ¶ 570.

19   This interoperability between tools "can further the development" of new EDA tools, and Real

20   Intent's products incorporating the disputed command sets offer IC designers an innovative tool

21   for testing ICs. And it is undisputed that the impact of Real Intent's copying of the disputed user

22   interface elements is a reduction of both "setup time" and "switching costs" for IC designers who

23   use Real Intent's EDA tools. RI SSUF 46. Thus, the record demonstrates that Real Intent used

24   the disputed command sets to create EDA tools "that could be readily used by [IC designers],"

25   which supports a finding that Real Intent's "use was consistent with that creative 'process' that is

26   the basic constitutional objective of copyright itself." *Google*, 593 U.S. at 30.

27

28

1    This effect on end users of the product incorporating the copied material further supports a

2    transformative finding.  The record in *Google* demonstrated "numerous ways in which

3    reimplementing an interface can further the development of computer programs," including that

4    "reimplementation of interfaces is necessary if programmers are to be able to use their acquired

5    skills."  *Google*, 593 U.S. at 31.  There was evidence that "shared interfaces are necessary for

6    different programs to speak to each other."  *Id.*  So too here, there is evidence that the copied user-

7    interface elements support interoperability for IC designers such that Real Intent's EDA tools can

8    read and understand Synopsys' design constraint format via their CLI and by allowing an IC

9    designer to load a script.  Although Synopsys contends that interoperability "does not require

10   copying of the disputed Synopsys command set elements" (Synopsys Resp. to RI SSUF 35) and

11   "EDA tools do not need to understand a script written using a competitor's command set in order

12   to work or interoperate with a competitor's EDA tool" (*id.*, SSUF 45), it is undisputed that the

13   practical effect of Real Intent's use is an EDA tool that can be readily used by IC designers.  A

14   similar argument was raised by Oracle in the context of factor three and rejected by the Supreme

15   Court.  Even though, "[i]n principle, Google might have created its own, different system of

16   declaring code," the Court still found its use transformative and fair and because Google's "basic

17   objective" was "to make use of their knowledge and experience using the Sun Java API when they

18   wrote new programs for smartphones with the Android platform."  *Google*, 593 U.S. at 34–35.

19   Similarly here, Synopsys acknowledges that Real Intent copied the disputed command sets

20   "to minimize customer 'ramp up' time by including [the disputed command sets] that customers

21   were already familiar with as a result of their familiarity of Synopsys' products."  ECF No. 271-12

22   at 8.  Dr. Edwards testified that consistency for command set elements across tools matters

23   because it "makes it easier" for the engineer "to understand the operation, predict how to write the

24   commands, how to choose them, [and] what to expect."  ECF No. 270-6.  The "more consistent"

25   the command sets are across tool, the "quicker" it is for engineers "to accomplish their goals."  *Id.*

26   Indeed, Real Intent customers made "many" requests for Real Intent to support the disputed user-

27

28
Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE

United States District Court
Northern District of California

interface elements.  Edwards Rep. ¶ 170.

Thus, although to a lesser degree here than *Google*, Real Intent's use similarly can further the development of EDA tools in the industry and the development of complex ICs, particularly in light of evidence in the record regarding Real Intent's objective in promoting interoperable solutions.  *See Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000) (copying to achieve compatibility recognized "as a legitimate [purpose] under the first factor of the fair use analysis"); *see also Teradyne, Inc. v. Astronics Test Sys., Inc.*, No. 20-CV-2713-GW-SHKX, 2023 WL 9284863, at *20 (C.D. Cal. Dec. 6, 2023) (crediting "connection between compatibility and transformativeness in the realm of computer programs" in finding competitive use "minimally transformative").

On the other hand, Synopsys presents evidence that, unlike Google who used the declaring code to create "new products" in the smartphone environment (which was different from Java SE's primary market of laptops and desktops), Real Intent used the command sets in part to make its existing tools more competitive—not to create new products—in the EDA tool market (which is the same primary market Synopsys exists in).  In support, Synopsys points to evidence that Real Intent launched its Meridian and Ascent products years before it began using the disputed command sets in those products—thus suggesting that any copying was done simply to improve the products and make more sales.  However, Real Intent's EDA tools were already using between 50–62% of the disputed user-interface elements during the pre-2015 period before Synopsys acquired Atrenta (and with it, Synopsys' competing product, Spyglass).  RI MSJ 20.

Synopsys also seeks to distinguish the facts here from *Google* because of the parties' status as competitors.  This issue requires a look at the timing and nature of the parties' relationship. While the parties agree that they have been competitors since 2015 (when Synopsys acquired Atrenta and with it, SpyGlass), Synopsys contends that, even before it acquired Atrenta, its PrimeTime suite of tools was used "to identify CDC issues," and Synopsys' Leda product competed with Real Intent's tools.  *See* RI SSUF 54.

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

United States District Court
Northern District of California

Synopsys' contention that the parties competed prior to 2015, and Synopsys' PrimeTime tool competed with Real Intent's tools, is belied both by testimony from its own experts and its counsel's statements during this case. For instance, Synopsys' damages expert, Mr. Napper, testified that Real Intent had "no direct competing product to PrimeTime," that "Real Intent doesn't offer a direct product that has the functionality of PrimeTime," and Mr. Napper did not identify any lost sales of PrimeTime or any other non-SpyGlass product based on Real Intent's copying. ECF No. 361-7 at 90:10–24, 250:17–23, 262:17–20. Dr. Edwards testified that "Synopsys first launched a CDC [static verification] product in 2015 after it acquired Atrenta" and that, before then, Synopsys "did not have tools that would have been considered sort of alternatives that users . . . customers would have considered." ECF No. 361-6 at 259:3-13. Finally, during discovery, Synopsys took the position that "documents regarding competitive analysis of products other than Spyglass are not relevant because Real Intent competes with Spyglass." ECF No. 362-4.

The record supports finding at, there is no *genuine* dispute that, at the time Real Intent began using the disputed command sets in 2010, Synopsys did not have a product that directly competed with Real Intent, and the asserted Synopsys works were in a different EDA market segment than CDC verification tools. And prior to Synopsys' acquisition of Atrenta, many of the disputed user-interface elements were part of Real Intent's tools when Synopsys used them as a customer. But even crediting the documents cited by Synopsys that purport to show some level of competition between its tools and Real Intent's tools pre-2015, that fact is another the Court weighs in considering transformativeness as a whole.

In sum, the record supports that Real Intent used the disputed command sets to achieve consistency among EDA tools, which, practically, allowed IC designers to more efficiently test chips and promote innovation in the industry. At the time Real Intent used the command sets, the record demonstrates that Real Intent incorporated the command sets into innovative EDA tools that did not meaningfully compete with Synopsys' tools until Synopsys acquired Atrenta. The

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

United States District Court
Northern District of California

1    Court finds that, considering all the evidence in the record, Real Intent's use was transformative.

2        In addition to *Google*, this case closely resembles *Teradyne*.  There, the court considered

3    whether Astronics' use of Teradyne's code to enable former Teradyne customers to reuse test

4    program sets was fair use.  *Teradyne*, 2023 WL 9284863, at \*21.  In finding the use was "perhaps

5    somewhat transformative," the court observed that Astronics' use "enable[d] innovation," and

6    "limit[ed] anti-competitive power" despite evidence of competition between the parties.  *Id.*  The

7    court recognized the tension between Astronics' copying to create a product for use in the same

8    field and the fact that Astronics was motivated by a desire to address customer concerns that

9    would avoid additional risk and expense in changing vendors.  Ultimately, the court found that the

10   use was transformative, although by a very narrow margin, in light of *Sony*.  *Id.* at 20 (citing *Sony*

11   *Computer*, *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000) ("If the

12   use in *Sony Computer* was transformative, the Court feels compelled to conclude that Astronics'

13   use here was too").

14       As in *Teradyne*, the copying here appears to have been, at least in part, motivated by an

15   effort to make Real Intent's products more attractive to customers.  However, weighing this fact

16   against the fact that Real Intent copied to create new EDA tools at a time when the parties did not

17   meaningfully compete and doing so ultimately promoted innovation in the industry leads the Court

18   to conclude the Real Intent's use was transformative under *Google*'s framework.

19       Finally, although relevant, the "commercial nature of the use is not dispositive."  *Andy*

20   *Warhol*, 598 U.S. at 531.  The commercial nature "is to be weighed against the degree to which

21   the use has a further purpose or different character."  *Id.*  While there is no dispute that Real

22   Intent's use of Synopsys' disputed command sets was commercial, the Court finds that Real

23   Intent's transformative use of the command sets outweighs the commercial nature.  *See Google*,

24   593 U.S. at 31 (concluding Google's commercial use not dispositive of first factor "in light of the

25   inherently transformative role that the reimplementation played in the new Android system.").

26       In sum, this factor weighs in favor of fair use.

27

28   Case No.: 20-cv-02819-EJD
     ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
     TO EXCLUDE
                                          39

1

## 2.      Factor 2: The nature of the copyrighted work

The second fair use factor, "the nature of the copyrighted work," reflects the fact that not all copyrighted works are entitled to the same level of protection. *Sega Enter. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th Cir. 1992), as amended (Jan. 6, 1993).  The protection established by the Copyright Act for original works of authorship does not extend to the ideas underlying a work or to the functional or factual aspects of the work.  *Id.* (citing 17 U.S.C. § 102(b)).  Computer programs "pose unique problems for the application of the "idea/expression distinction" that determines the extent of copyright protection."  *Id.*  "To the extent that there are many possible ways of accomplishing a given task or fulfilling a particular market demand, the programmer's choice of program structure and design may be highly creative and idiosyncratic."  *Id.* ("In some circumstances, even the exact set of commands used by the programmer is deemed functional rather than creative for purposes of copyright").

It is undisputed that the asserted works are EDA tools used by engineers in a process called the "design flow" to design, analyze, test, and manufacture IC designs.  RI SSUF 1.  Synopsys disputes, however, that the copied elements have function.  *Compare* Synopsys Opp. 13 ("[I]t is undisputed that the copied elements themselves have no function at all: Real Intent's experts and employees concede that the name and syntax of a command set element is distinct from its function and can be changed without altering its function") *with* RI Reply 3 ("[C]ommand sets do have an undisputed function: they are part of the software's user interface and are used by IC designers to communicate with and control the disputed tools").

While acknowledging that computer programs undeniably have functional components, Synopsys argues that the second factor weighs against finding fair use because evidence in the record confirms that the creation of command set elements like those at issue involves a myriad of creative choices from among many available options.  Synopsys MSJ 18.  The copied elements themselves, Synopsys argues, have no function at all because "the name and syntax of a command set element is distinct from its function and can be changed without altering its function."

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

United States District Court
Northern District of California

1    Synopsys Opp. 13.

2            Real Intent responds that the disputed commands, options, objects, attributes, and

3    variables, are part of the user interface of the asserted works, that are (like the API declarations in

4    *Google*) bound together with uncopyrightable ideas.  RI MSJ 14.

5            This factor leans in favor of fair use.  Even if the creation of command set elements like

6    those at issue here include "creative choices," the command sets themselves are still further from

7    the core of copyright.  *Google* is instructive again on this issue.  In analyzing the second factor, the

8    Court distinguished between three aspects of the technology at issue in the case: (1) the

9    "implementing code" (uncopied source code), (2) the "method call," and (3) the "declaring code."

10   *Google*, 593 U.S. at 27.  As part of the user interface, the declaring code was "inextricably bound

11   up" both with implementing code and the method calls.  *Id.* at 27.  The Court contrasted the

12   "innovative implementing code" with the declaring code: while the former involved "new creative

13   expression," the latter embodied a "different kind of creativity," because the creators wanted to

14   select names "that would prove intuitively easy to remember" in order to "attract programmers

15   who would learn the system."  *Id.* at 28.

16           Similar to the declaring code in *Google*, the command sets here are "a text-based interface

17   through which a user can control the tool's behavior and describe to the tool certain properties of

18   the user's circuit design."  ECF No. 204-2 at 1.  Indeed, Synopsys stated in an amicus brief filed in

19   the *Google* proceedings that "Synopsys' command sets are similar to the 'declaring code' at issue

20   in [Google's] appeal."  Br. for Synopsys as Amicus Curiae Supporting Respondent ("Amicus

21   Br.") at 1, No. 18-956 (Feb. 19, 2020).  Also similar to the declaring code in *Google*, the disputed

22   command sets here are inherently bound together with the organization of the user interface and

23   the underlying source code.

24           Additionally, Synopsys' user interface guidelines instructed its engineers that

25   ████████████████████████████████████████████████ (ECF No. 270-10 at -00619303) which

26   aligns with the "different kind of creativity" the Supreme Court observed was involved in

27   Case No.: 20-cv-02819-EJD

28   ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
     TO EXCLUDE

United States District Court
Northern District of California

1    designing the declaring code.  *Google*, 593 U.S. at 28 (creators of the declaring code "tried to find

2    declaring code names that would prove intuitively easy to remember").

3         The Court recognizes that, unlike Oracle who "sought to make the API 'open'," Synopsys

4    makes its command sets available via a license.  *See* Synopsys Opp. 15.  And the fact that

5    Synopsys—as opposed to its customers —modifies and improves its EDA tools further

6    distinguishes the nature of the copyrighted work here from that in *Google*.  Unlike the declaring

7    code in *Google*, the value in Synopsys' command sets lies in sales of its software.

8         On balance, this factor leans in favor of fair use.  Although the authors of the disputed

9    command sets may have made creative choices about which words to use, evidence in the record

10   confirms that those choices are constrained and involve established chip-design terminology.  The

11   disputed command sets, which are admittedly like the declaring code at issue in *Google*, are

12   "[l]ike other computer programs" in that they are "functional in nature" and bound together with

13   uncopyrightable ideas and underlying source code.

### 3.   Factor 3: The amount and substantiality of the portion used in relation to the copyrighted work as a whole

14

15        In the context of the third factor, "even a small amount of copying may fall outside of the

16   scope of fair use where the excerpt copied consists of the 'heart' of the original work's creative

17   expression."  *Google*, 593 U.S. at 33 (quoting *Harper & Row Publishers, Inc. v. Nation Enter.*,

18   471 U.S. 539, 564–65 (1985)).  On the other hand, "copying a larger amount of material can fall

19   within the scope of fair use where the material copied captures little of the material's creative

20   expression or is central to a copier's valid purpose."  *Id.* (quotations omitted).

21        The parties appear to agree that the amount copied was quantitatively insignificant (1.1%

22   of the total command sets), and evidence in the records supports a finding that the use was

23   qualitatively significant ("critical" for Real Intent's customers).

24        Real Intent argues that this factor favors fair use because even if the amount copied was a

25   "substantial portion" copied verbatim, *Google* instructs that this factor can favor fair use where

26   "the amount of copying was tethered to a valid and transformative purpose."  RI Opp. 8 (quoting

27

28

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE

United States District Court
Northern District of California

United States District Court
Northern District of California

*Google*, 593 U.S. at 34). Because Real Intent used the disputed command set elements to allow chip designers to continue to use them with new EDA tools, and because Real Intent did not copy implementing (source) code, Real Intent argues this factor weighs in favor of fair use.

The parties again dispute the applicability of the Supreme Court's finding on this factor to the facts here. Real Intent emphasizes that any copying was required to achieve interoperability. In *Google*, the Supreme Court concluded that the substantiality factor weighed in favor of fair use because (1) the copied material was "inseparably bound" to the non-copied material; (2) Google copied the lines it did because "it would have been difficult, perhaps prohibitively so, to attract programmers to build its Android smartphone system without them," and (3) Google's "basic purpose" in copying was "to create a different task-related system for a different computing environment." *Google*, 593 U.S. at 34. In sum, the amount of copying in *Google* was tethered to a valid and transformative purpose. *Id.* at 34–35 (commenting that the copied material "was the key that [Google] needed to unlock the programmers' creative energies").

Here, Real Intent states it used the command sets because, similar to Google's stated purpose, chip designers have learned to work with the disputed command sets and wished to continue to use them with Real Intent's EDA tools. In this sense, Real Intent's use was like Google's: both sought to attract users based on the user's preexisting knowledge and experience. But Real Intent, unlike Google, appeared to have used at least some portion of the disputed command sets to make its products more competitive in the same industry. *See* RI SSUF 118 (explaining that some, but not all, of the disputed user-interface elements were used in Real Intent's tools prior to 2015).

The amount of copying was objectively minor, but this is balanced against testimony from witnesses that the qualitative value of the command set elements was significant. *See* ECF No. 272-10 at 68:21–69:14 (the proprietary commands shared across Synopsys' suite of tools are a ███████████████ for customers); ECF No. 325-7 at 126:12-17 (Synopsys' command sets are ██ ███████████████████████████████████████████████████████████████

▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩

▩▩▩▩▩▩▩▩▩▩▩▩▩▩; ECF 265-7 at 217:1–218:2 ("Q: Is it your view that Real Intent's ability to support the disputed command set elements is critically important? A: I believe it's critically important to IC designers, yes").  As Real Intent points out, the testimony from Mr. Gupta, Synopsys' Rule 30(b)(6) witness on competition topics, explained that the reason the command sets are so important is because customers ▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩ and ▩▩▩▩▩▩▩▩▩▩▩▩▩ ECF No. 361-5 at 68:21–70:21.

The Supreme Court also noted that the "substantiality" factor would "generally weigh in favor of fair use where, as here, the amount of copying was tethered to a valid, and transformative, purpose."  *Google*, 593 U.S. at 34.  As in *Google*, the disputed command sets are intertwined with the non-copied source code, Real Intent intentionally selected the disputed command sets to incorporate because "it would have been difficult, perhaps prohibitively so, to attract [IC designers] to build its [new EDA tools] without them," and Real Intent's "basic purpose" in copying was to "permit [IC designers] to make use of their knowledge and experience" with Synopsys' design constraint format when testing their chip designs on Real Intent's EDA tools.

In sum, the Court finds that under *Google*, this factor also favors fair use.  Even though evidence supports finding that the minor amount of copying played an important role in developing Real Intent's products, the copying was tethered to a transformative purpose in developing new CDC verification tools.

### 4.   Factor 4: The effect of the use upon the potential market for or value of the copyrighted work

The fourth factor, the effect of the use upon the potential market for or value of the copyrighted work, "requires courts to consider the secondary use's impact on the market for the original work and the market for derivative works, including if the defendant's actions became 'unrestricted and widespread.'"  *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1280 (9th Cir. 2013).  "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented."  *Harper & Row Publishers*,

1  471 U.S. at 569.  To defeat a fair use defense, "one need only show that if the challenged use

2  should become widespread, it would adversely affect the potential market for the copyrighted

3  work."  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 744 (9th Cir. 2019).  In analyzing this factor,

4  the Supreme Court in *Google* noted that multiple considerations are relevant, including (1) "the

5  amount of money that the copyright owner might lose," (2) the source of the loss, and (3) "the

6  public benefits the copying will likely produce."  *Google*, 593 U.S. at 35.

7      Synopsys argues that this factor weighs against a finding of fair use because Synopsys has

8  identified more than ▓▓▓▓▓ in lost sales of its competing product, Spyglass, since 2015, and

9  Real Intent and Synopsys' products have competed for at least the past nine years, and before that,

10  Real Intent's products were, at a minimum, in markets "likely to be developed" by Synopsys.

11  Synopsys Reply 10.

12      In response, Real Intent contends that (1) its use could not have caused any harm to the

13  market for or value of Synopsys' work prior to 2015 because its products did not compete with

14  any Synopsys product when Real Intent launched the products in 2010, (2) Synopsys has not

15  proven that it lost "a single dollar in sales," and (3) Real Intent's use was transformative, and

16  "[w]idespread transformative uses to create new products that do not compete with existing

17  Synopsys products could not possibly cause a cognizable harm to Synopsys."  RI Opp. 9–10.

18      As to the likely amount of loss, Real Intent's Meridian CDC and Ascent Lint products

19  compete directly with Synopsys' Spyglass products and have since 2015—they are market

20  substitutes.  Unlike Google's Android platform which was "part of a distinct (and more advanced)

21  market than Java software," Real Intent's products are sold in the same market as Synopsys'

22  Spyglass product.  Even if the parties were not direct competitors when Real Intent first copied

23  (*see supra* Part V(B)(1)), the impact of continued copying by Real Intent would result in further

24  revenue loss for Synopsys.

25      However, "a potential loss of revenue is not the whole story" under this factor.  *Google*,

26  593 U.S. at 35.  The Supreme Court recognized that Google's copying "helped Google make a

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

vast amount of money from its Android platform," and "enforcement of the Sun Java API copyright might give Oracle a significant share of these funds."  *Id.* at 38.  Despite what seemed to be an unfair result of copying, the Court explained that "[i]t is important" to consider that, as time passes, this new API, was valuable because users "have already learned how to work with it."  *Id.* at 38–39.  The source of Android's profitability had "much to do with third parties' (say, programmers') investment in Sun Java programs."  *Id.* at 39.

Looking beyond the potential loss of revenue, evidence in the record supports that the disputed command sets are valuable because IC designers have already learned how to work with them.  IC designers spend time learning the disputed command sets to operate Synopsys software, and "customers become familiar with the 'Synopsys' way of expressing commands and continue to use Synopsys."  Amicus Br. at 3.

Finally, courts "must take into account the public benefits the copying will likely produce."  *Google*, 593 U.S. at 35.  And courts "are free to consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially."  *Sega*, 977 F.2d at 1523.  This "[p]ublic benefit need not be direct or tangible, but may arise because the challenged use serves a public interest."  *Id.*  The parties provide competing views regarding the purported benefit to the public resulting from the copying at issue.  Synopsys argues that Real Intent's use serves no public benefit and disincentivizes innovation because it permits companies like Real Intent to copy the disputed command sets rather than create their own.  In contrast, evidence in the record demonstrates that customers had familiarity with the disputed command sets and using them saved time and money for IC designers.  Synopsys' damages expert testified that ███████████████████████████████████████████████████████ ████████████████████████ ECF No. 270-8, Napper. Rep. ¶ 90.  And these costs from switching to a non-Synopsys chip-design tool, according to Synopsys' technical expert, can have "a lock-in-like" effect.  ECF No. 270-6 at 254:17–21.  In that sense, Real Intent's (and other vendors') use of the disputed command sets could "allow[] new computer code to more easily

enter the market." *Google*, 593 at 39 ("Given the costs and difficulties of producing alternative APIs with similar appeal to programmers, allowing enforcement [] would make of the Sun Java API's declaring code a lock limiting the future creativity of new programs"); *see also Teradyne*, 2023 WL 9284863, at *27 (finding fourth factor favored fair use where Teradyne prevented competition "by virtue of its customers being 'locked-in' to its devices through their reliance on TPSs written for those devices," and explaining that such anti-competitive behavior "is not something this country's copyright laws are designed to achieve").

Under *Google*, this factor tips beyond neutral to favor fair use. There is no question that the parties compete directly in the market now, and Real Intent's use has, and will continue, to cause Synopsys to suffer potential lost revenues. At the same time, the record supports that disputed command sets are valuable because IC designers are familiar with them. Thus, like Google's use, Real Intent's use serves an important public benefit of promoting competition and innovation in the industry.

\* \* \*

Based on the evidence in the record, all four factors weigh in favor of finding fair use. The Court identifies no genuine disputes of material fact that would preclude finding Real Intent's use of the copyrighted material fair as a matter of law under 17 U.S.C. § 107. Accordingly, Real Intent is entitled to summary judgment on its fair use defense.

### C.    Remaining Copyright Affirmative Defenses

Synopsys' motion for summary judgment as to Real Intent's copyright affirmative defenses (fifth (laches, estoppel, waiver), sixth (inaction), seventh (unclean hands), eighth (copyright misuse), ninth[4] (license), tenth (words and short phrases and methods of operation), eleventh (merger and scènes à faire), twelfth (de minimis copying), thirteenth and fourteenth

---

[4] Real Intent presented no argument regarding its affirmative defense of Synopsys' patent infringement claims. Accordingly, the Court will presume Real Intent no longer intends to pursue the affirmative defense to Synopsys' patent infringement claims.

(copyright preemption / doctrine of copyright exhaustion), seventeenth[5] (statute of limitations), twenty-third (lack of registration) are moot in light of the Court's ruling on fair use.

### D. Conclusion

For the foregoing reasons, the Court rules as follows on Synopsys' motion for partial summary judgment:

- Count II (Breach of Contract): GRANTED as to Synopsys' claim for breach of (1) Section 3.2 of the in-Sync Agreements and Section 2.3 the 2017 Synopsys Loan Agreement; and (2) Section 5.1 of the in-Sync Agreements and the 2017 Synopsys Loan Agreement.

- Fourth Affirmative Defense (Fair Use): DENIED.

- Remaining Affirmative Defenses: DENIED AS MOOT.

## VI. REAL INTENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Real Intent moves for summary judgment on (1) its fair use defense, (2) Synopsys' copyright claim because the disputed command sets are not copyrightable under 17 U.S.C. § 102(b); (3) Synopsys' copyright claim based on alleged copying of unregistered "compilations" within the asserted works; (4) Synopsys' breach of contract claim on federal preemption grounds; and (5) Synopsys' breach of implied covenant claim because it is duplicative of its contract claim and is also preempted by the Copyright Act.

### A. Fourth Affirmative Defense (Fair Use)

The Court evaluated Real Intent's fair use defense above. For the reasons explained in Part V(B) *supra*, the Court finds that summary judgment on fair use should be granted in favor of Real Intent. This applies to Real Intent's fair use defense of the alleged copying of user manual excerpts.

---

[5] Real Intent does not contest that summary judgment should be granted on its statute of limitations defense as to Synopsys' patent, breach of contract, and tortious interference claims.

**B.     Copyright Claims**

The Court denies as moot Real Intent's motion for summary judgment on Synopsys' copyright claim, including its motion as to the compilation copyright claim, in light of the Court's finding as to fair use above.

**C.     Breach of Contract Claim**

The Court evaluated Real Intent's preemption arguments regarding Synopsys' breach of contract claim above.  For the reasons explained in Part V(A) *supra*, the Court granted in part Synopsys' breach of contract claim.  Accordingly, Real Intent's motion for summary judgment as to Synopsys' breach of contract claim is denied.

**D.     Implied Covenant Claim**

Finally, Real Intent moves for summary judgment on Synopsys' breach of the implied covenant of good faith and fair dealing on the basis that it is impermissibly duplicative of the contract claim and is preempted by the Copyright Act.  Synopsys contends that its implied covenant claim is not duplicative of its breach of contract claim because its implied covenant claim "includes Real Intent's active concealment of its breach of those contracts, including the lengths to which Real Intent went to prevent Synopsys detecting is [sic] improper access and use of DesignWare."  Synopsys Opp. 30.

"[I]f the allegations in a breach of implied covenant claim do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated."  *Fibrogen, Inc. v. Hangzhou Andao Pharm. Ltd.*, No. 22-CV-07148-AMO, 2024 WL 1199018, at *11 (N.D. Cal. Mar. 20, 2024) (quoting *Malcolm v. JP Morgan Chase Bank, N.A.*, No. 09-CV-4496, 2010 WL 934252, *6 (N.D. Cal. Mar. 15, 2010)); *Pierry, Inc. v. Thirty-One Gifts, LLC*, No. 17-CV-03074-LB, 2018 WL 1684409, at *9 (N.D. Cal. Apr. 5, 2018) (same).

Synopsys' implied covenant claim does not go beyond the statement of a mere contract

United States District Court
Northern District of California

breach, and Synopsys relies on the same alleged acts and seeks the same damages already claimed in its breach of contract claim.  In support of its implied covenant claim, Synopsys alleges that Real Intent "entered into contracts with Synopsys" and "nothing in [those contracts] authorize[d]" Real Intent to act as it did.  *See* SAC ¶¶ 83–86.  The core allegation is that Real Intent incorporated parts of Synopsys' products and misused Synopsys' confidential information in violation of the parties' agreements.  *Id.* ¶¶ 88–91.  Real Intent's alleged concealment of its breach of those contracts does not change the Court's conclusion.  While a claim for breach of the implied covenant may be made out by allegations that a defendant acted in bad faith to frustrate the agreed common purpose of the contract, *see Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990), Synopsys cites evidence that supports its breach of contract claim.  Additionally, Synopsys seeks the same damages already claimed in its breach of contract claim.  ECF No. 270-8 at 299:03–08 (Synopsys' damages expert confirming that damages for the breach of contract claim is "exactly the same" or "broader" than implied covenant claim); *see Vigdor v. Super Lucky Casino, Inc.*, No. 16-CV-05326-HSG, 2018 WL 6069944, at *7 (N.D. Cal. Nov. 20, 2018) (granting summary judgment and dismissing implied covenant claim where "Plaintiffs' claim relies on the same acts—and seeks the same damages—as their claim for breach of contract").

Accordingly, Real Intent's motion for summary judgment on Synopsys' breach of the implied covenant of good faith and fair dealing is granted.

### E.    Conclusion

For the foregoing reasons, the Court rules as follows on Real Intent's Motion for Partial Summary Judgment:

- Fourth Affirmative Defense (Fair Use): GRANTED.

- Count I (Copyright Infringement): DENIED AS MOOT.

- Count I (Copyright Infringement of Compilations): DENIED AS MOOT.

- Count II (Breach of Contract): DENIED.

Case No.: 20-cv-02819-EJD
ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE

United States District Court
Northern District of California

- Count III (Breach of Implied Covenant of Good Faith and Fair Dealing): GRANTED.

**IT IS SO ORDERED.**

Dated: August 26, 2024

EDWARD J. DAVILA
United States District Judge