**WILLKIE FARR & GALLAGHER LLP**
Krista S. Schwartz (Bar No. 303604)
  kschwartz@willkie.com
Barrington Dyer (Bar No. 264762)
  bdyer@willkie.com
Joshua D. Anderson (Bar No. 312836)
  jdanderson@willkie.com
Stephen Henrick (Bar No. 310539)
  shenrick@willkie.com
Jacob Karim (Bar No. 340376)
  jkarim@willkie.com
Christopher J. Lee (Bar No. 342055)
  clee3@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Telephone: (415) 858-7400

**WILLKIE FARR & GALLAGHER LLP**
Shaimaa M. Hussein (*Pro Hac Vice*)
  shussein@willkie.com
Devon W. Edwards *(Pro Hac Vice)*
  dedwards@willkie.com
787 Seventh Ave.
New York, NY 10019
Telephone: (212) 728-8000

**WILLKIE FARR & GALLAGHER LLP**
Dane Sowers (*Pro Hac Vice*)
  dsowers@willkie.com
1875 K Street, N.W.
Washington, DC  20006
Tel: (202) 303-1000

Attorneys for Plaintiff
SYNOPSYS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNOPSYS, INC.<br><br>                    Plaintiff,<br><br>    v.<br><br>REAL INTENT, INC.<br><br>                    Defendant. | Case No. 5:20-cv-02819-EJD (SvK)<br><br>**NOTICE OF MOTION AND MOTION FOR NEW TRIAL**<br><br>Complaint Filed:  4/23/2020<br>Trial Date:        10/15/2024 |

## NOTICE OF MOTION AND HEARING

PLEASE TAKE NOTICE that on February 13, 2025, at 9:00 a.m., in the courtroom of the Honorable Edward J. Davila, located in Courtroom 4, 5th Floor of San Jose Courthouse at 280 South First Street, San Jose, CA 95113, or as soon thereafter as counsel may be heard, Plaintiff Synopsys, Inc. ("Synopsys") will and hereby does move for a new trial pursuant to Federal Rule of Civil Procedure 59. This motion is based on the Memorandum of Points and Authorities herein and exhibits attached thereto; the pleadings and papers on file in this action, including the trial transcript and admitted exhibits; and such further argument and material as the Court may consider.

## RELIEF REQUESTED

Synopsys respectfully requests an order vacating the jury's damages award in this case with respect to Real Intent's breach of Section 3.1 of the in-Sync Agreements and Section 2.3 of the Synopsys Loan Agreement, and setting the case for a new trial for an accounting of Synopsys' lost profits as soon as the Court's calendar permits.

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................. 3

III.  LEGAL STANDARDS ......................................................................................... 6

IV.   ARGUMENT ........................................................................................................ 7

      A.    The Jury's Apportionment of Synopsys' Lost Profits Was Contrary to Law........... 7

      B.    The Jury's Damages Award Was Supported Only by Attorney Argument, and
            Cannot Stand ........................................................................................... 10

      C.    The Jury's Verdict Was Infected by Repeated Attorney Argument that Copying
            Commands from Sources Other than Design Vision Was "Authorized" or
            "Permitted" by the Contracts at Issue ...................................................... 13

V.    CONCLUSION ................................................................................................... 18

SYNOPSYS' MOTION FOR NEW TRIAL
Case No. 5:20-cv-02819-EJD (SvK)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alford v. Haner,*
446 F.3d 935 (9th Cir. 2006) .........................................................................................6

*Antonick v. Elec. Arts Inc.,*
No. 11-cv-1543, 2014 WL 245018 (N.D. Cal. Jan. 22, 2014)..........................................10

*Automatic Equip. Mfg. Co. v. Danko Mfg., LLC,*
582 F. Supp. 3d 649 (D. Neb. 2022)...............................................................................12

*Bandary v. Delta Air Lines, Inc.,*
623 F. Supp. 3d 1071 (C.D. Cal. 2022) ....................................................................10, 11

*C.R. v. PLB Mgmt. LLC,*
No. 2:21-cv-03275, 2023 WL 3868353 (C.D. Cal. June 7, 2023)....................................10

*Cave Consulting Grp., LLC v. Optuminsight, Inc.,*
No. 5:11-CV-00469-EJD, 2016 WL 4658979 (N.D. Cal. Sept. 7, 2016)...................6, 11, 13

*Colucci v. Callaway Golf Co.,*
748 F. Supp. 2d 629 (E.D. Tex. 2010) ......................................................................12, 13

*Cones v. Cnty. of Los Angeles,*
No. 14-cv-8281, 2016 WL 7438817 (C.D. Cal. Sept. 28, 2016) ...............................7, 13, 18

*Groupion, LLC v. Groupon, Inc.,*
859 F. Supp. 2d 1067 (N.D. Cal. 2012) ...........................................................................7

*Hazle v. Crofoot,*
727 F.3d 983 (9th Cir. 2013) .....................................................................................6, 10

*Icon Health & Fitness, Inc. v. Strava, Inc.,*
849 F.3d 1034 (Fed. Cir. 2017)......................................................................................6

*Intell. Ventures I, LLC v. Canon Inc.,*
104 F. Supp. 3d 629 (D. Del. 2015)................................................................................12

*Ironworks Pats., LLC v. Apple, Inc.,*
255 F. Supp. 3d 513 (D. Del. 2017).........................................................................7, 11, 12

*Mentor Graphics Corp. v. EVE-USA, Inc.,*
851 F.3d 1275 (Fed. Cir. 2017).................................................................................9, 10

*Molski v. M.J. Cable, Inc.,*
481 F.3d 724 (9th Cir. 2007) .............................................................................3, 6, 10, 13

*Pavemetrics Sys., Inc. v. Tetra Tech, Inc.,*
652 F. Supp. 3d 1098 (C.D. Cal. 2023) ....................................................................7, 13, 18

*Uniloc USA, Inc. v. Microsoft Corp.,*
632 F.3d 1292 (Fed. Cir. 2011).............................................................................13, 18

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
 34 F.Supp.3d 1061 (C.D. Cal. 2014) ........................................................................................9

**Other Authorities**

Fed. R. Civ. P. 59(a)(1) .................................................................................................................6

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Synopsys seeks a new trial for an accounting of Synopsys' lost profits on two bases:  (1) the jury's damages award is contrary to the law and evidence introduced at trial; and (2) Real Intent misrepresented that the contracts at issue authorized or permitted the copying of Synopsys commands from certain sources.

After trial, the jury determined that Synopsys was entitled to profits it lost as a result of Real Intent's breach of contract.  However, its quantification of $248,776 in lost profit damages cannot stand.  That figure is precisely 0.6% of the $41,462,677 in damages that Synopsys requested, and in awarding it, the jury accepted and relied on what became a centerpiece of Real Intent's defense at trial:  that Real Intent had copied only 0.6% of the commands in Synopsys' Design Vision product.  But that apportionment is wholly unsupported by any evidence and contrary to law.  The trial record is devoid of any evidence to justify the 0.6% calculation; that was a figure found only in attorney argument during Real Intent's opening and closing statements.  There was no witness or documentary evidence presented at trial to support the figure.  Additionally, the law does not merit any apportionment of lost profit damages in this case.  The jury's finding that Synopsys lost sales as a result of Real Intent's misconduct entitles Synopsys to the profits it would have made on those sales, and requires no further discounting.  These two independent bases both merit a new trial.

As the jury was instructed, Synopsys could recover lost profits only if it could prove both that it suffered harm and that "Real Intent's breach was a substantial factor in bringing about the claimed damages."  (ECF 797, Final Instruction No. 12.)  The jury so found, and used as a starting point in calculating damages Synopsys' requested damages amount, which focused on sales made by Real Intent to six customers, between 2017 and 2024, that otherwise would have purchased Synopsys' tools.  The inquiry should have ended there.  Once the jury determined that Synopsys lost sales because Real Intent incorporated Design Vision's command set elements into its own products, it had no basis in fact or law to reduce Synopsys' compensation by the (supposed) proportion of command set elements that Real Intent copied.  Simply put, there is no support in the record for the jury's determination that Real Intent made only a portion of the challenged sales because it breached

its contracts with Synopsys, nor was the jury instructed on apportionment (because none is necessary or appropriate in a case like this one). Rather, Real Intent's breach enabled it to make 100% of the at-issue sales, thus costing Synopsys 100% of its requested lost profits—regardless of how many commands, options or attributes, with syntax, it took.

Moreover, even if there existed in the record *some* basis to reduce Synopsys' lost profits, the jury's adoption of Real Intent's unsupported 0.6% calculation was not one of them. Even Real Intent itself never embraced such an approach; it never presented an alternative damages proposal, instead maintaining that the appropriate amount of damages was zero. Beyond that, Real Intent did not substantiate the 0.6% figure offered by its counsel with any fact witness or technical expert testimony; instead, it appears to derive from the report of an expert who did not testify at trial. Real Intent's counsel's adoption of the figure—and references to it in both the opening statement and closing argument—was improper and certainly cannot serve as the basis for the jury's damages award. It is black letter law that damages cannot be based on attorney argument—much less groundless and inaccurate attorney argument.[1] This complete lack of evidence supporting the jury's award entitles Synopsys to a new trial for an accounting of its lost profits damages.

Separately, a new trial is warranted as a result of Real Intent's repeated false and prejudicial assertions that some of the command set elements it incorporated into its tools without authorization—including copying before the contracts were signed, or from Synopsys' other products—was "authorized" or "permitted" under the parties' contracts. This, too, became a calling card of Real Intent's case, repeated during both opening statement and closing argument. And despite Synopsys' requests, the Court declined to issue a curative instruction. Of course, the in-Sync and Synopsys Loan Agreements at issue in this case say nothing of the sort: they specify that Real Intent **could not** copy commands from Design Vision, not that Real Intent **could** copy commands from other Synopsys sources. And, Synopsys expressly refused to allow Real Intent access to its PrimeTime product—a supposed "permitted" source of the command set elements. Yet,

---

[1] Indeed, the Court repeatedly reminded the jury that attorney argument is not evidence. (*See, e.g.*, ECF 811–821, "Trial Tr." at 304:13–16, 315:2–3, 1781:6–10, 1781:23–24, 1783:2–6.)

the jury was repeatedly exposed to highly damaging statements that necessarily provided it with the impression that Synopsys permitted Real Intent to copy some commands while arbitrarily seeking to protect certain other commands. This is further grounds for a new trial.

A plaintiff is entitled to a new trial where the jury's verdict is "against the weight of the evidence" and is legally unsupportable. *See Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). Such relief is also appropriate where the trial was "not fair to the party moving." *Id.* Both of these factors are prevalent here. Nor would a new trial require relitigating all disputed factual issues; the jury has already resolved nearly all of them. It found that Synopsys was entitled to lost profits, rejected Real Intent's defenses of unforeseeability, failure to mitigate, and lack of causation, and determined that Real Intent copied both the undisputed and the disputed commands from Design Vision after April 2013. Any new trial would thus be limited to an accounting of Synopsys' lost profits caused by Real Intent's contract breaches.[2]

## II.    FACTUAL BACKGROUND

At summary judgment, the Court determined Real Intent breached its agreements with Synopsys by copying Synopsys' proprietary commands, options and attributes, with syntax. (ECF 513 at 27–28.) However, the parties maintained live disputes regarding the scope of that breach, and whether Synopsys was entitled to lost profits as a result of the breach. At trial, the jury was asked to resolve these issues. It was instructed that it could only award damages based on commands copied from Design Vision after April 2013—and thus, in violation of the contracts. (ECF 797 at 14.)

At trial, Synopsys presented its evidence of lost profits. It demonstrated that Real Intent's copying had caused Synopsys to lose sales between 2017 and 2024 to six customers, all of whom

---

[2] In addition, granting the limited new trial Synopsys seeks is likely to result in judicial efficiency, as a record-supported verdict on breach-of-contract damages will likely finalize the resolution of those claims. Otherwise, the parties (and the courts) are likely to spend considerable resources litigating contract damages both at the Court of Appeals and potentially on remand in this Court.

demanded static verification software that supported the command set elements at issue.  *See, e.g.*, Trial Tr. at 968:13–984:10 (Gupta); Trial Tr. at 1065:14–1066:19, 1076:18–1078:13 (Napper); Trial Tr. at 1361:22–1362:1, 1379:7–24, 1388:8–1389:8 (Sachdeva); Trial Tr. at 685:3–9 (Ma).  Synopsys was able to meet that need through its VC SpyGlass product; absent its breach, Real Intent would not have been able to do the same.  *See generally* TX-729-012, TX731-004; Trial Tr. at 947:9–949:7, 985:23–986:14; 1025:13–1026:3 (Gupta).  As Synopsys' damages expert, Brian Napper, explained, Real Intent made approximately ▮▮▮▮▮▮ in sales to these six customers—sales that would have gone to Synopsys absent Real Intent's breach of contract.  (Trial Tr. at 1079:1–5 (Napper).)  Applying Synopsys' average profit margin of ▮▮ percent to those sales, Mr. Napper opined that Synopsys would have earned $41,462,677 in profits but-for Real Intent's breach of the parties' agreements.  *Id.* at 1079:6–13, 1089:2–7.  Real Intent did not offer an alternative damages figure through its damages expert or any other witness.  Instead, Real Intent focused on causation: it sought to prove that its copying of command set elements was not the reason Synopsys lost the sales at issue.  *See* Trial Tr. at 343:14–17 (Real Intent's conduct "caused [Synopsys] no harm whatsoever") (opening); Trial Tr. at 346:17–18 ("Clearly [Real Intent's copying] had no financial impact whatsoever on Synopsys.") (opening); Trial Tr. at 1728:17–20 ("There's been no harm shown … and no damages either.") (closing); Trial Tr. at 1751:24–25 ("Synopsys has failed to prove damages.") (closing); *see also* Trial Tr. at 1584:23–25, 1641:9–11 (Bennis).  Thus, the only lost profits amount presented at trial was the $41,462,677 in profits that Synopsys' damages expert presented.

The 0.6% figure that the jury used to apportion those lost profits was presented only as part of Real Intent's attorney argument.  As it stated in opening argument—and reiterated in closing:  "if you give Synopsys credit for everything, disputed/undisputed," the commands at issue amounted to 0.6% of the total commands in Design Vision.  *See* Trial Tr. at 360:17–22 (opening).  During opening, Real Intent's attorney displayed a Venn diagram with the number "0.6%" and argued that "the copying that [Synopsys is] complaining about is less than 1 percent of the total commands in Design Vision."  Trial Tr. at 360:20–22 (opening); DDX1-039.  And during closing, Real Intent's counsel displayed the same Venn diagram to the jury and explained that "[t]he commands at issue

in this case amount[] to 6 percent, or .6, excuse me, less than 1 percent of all the commands in Synopsys'[] Design Compiler product."  Trial Tr. at 1752:22–25.  But this figure did not feature in the presentation of evidence at trial.  Critically, ***not one*** witness or trial exhibit supports Real Intent's attorney argument, nor the jury's verdict that rests upon it.  In fact, the closest testimony on this point came from Real Intent's damages expert, Melissa Bennis, who offered a different figure altogether:  that "[t]he commands that I understand are arguably in dispute here are less than 2 percent of all the thousands of commands that it takes to run these tools," although she could not elaborate on how that number was derived.  Trial Tr. at 1578:20–22.  But Ms. Bennis' 2% figure refers to a different percentage entirely—namely, the percentage of commands in Meridian (as opposed to Design Vision) that are at issue in this case.  *See* DDX6-017; *see also* DDX1-038; Trial Tr. at 360:10–16 (opening).  Simply put, it is not possible to use the trial record to obtain the 0.6% figure put forth by Real Intent's counsel.[3]

The only reference in the case record to the 0.6% figure is in the expert report of Brad Quinton, an expert ***who did not testify at trial***—and no fact witness or expert testified at trial to that figure.  *See* ECF 308-3 at 183.  Simply put, Real Intent never substantiated the figure its counsel repeatedly put forward, and which became the basis for the jury's damages award.

In awarding damages to Synopsys, the jury necessarily rejected Real Intent's claim that there was no causation between the contract breaches and Synopsys' lost profits.  The jury also rejected Real Intent's other defenses including the lack of foreseeability of lost profit damages.  That is, the jury gave Synopsys "credit for everything, disputed/undisputed," and found that Real Intent had unlawfully incorporated all of the commands, options, and attributes at issue, causing Synopsys to lose sales.  *See* Trial Tr. at 360:18–22.  Having so determined, there was only one damages figure in the record for the jury to consider: the $41.46 million presented by Synopsys' damages expert.

---

[3] There were 74 disputed and undisputed command/option pairs.  TX2203.  Through the only technical expert to testify in this case, Dr. Stephen Edwards, Synopsys presented evidence that Design Compiler contained a total of 5,416 command/option pairs.  TX339.  It is impossible to square these figures with Real Intent's conclusory 0.6% figure.

SYNOPSYS' MOTION FOR NEW TRIAL
Case No. 5:20-cv-02819-EJD (SvK)

Nonetheless, the jury incorrectly adopted the baseless arguments of Real Intent's attorneys and apportioned its damages award, thereby reducing it by 99.4%.

In addition to argument about the amount of command set elements taken from Design Vision, Real Intent also repeatedly offered attorney argument that certain copying from Synopsys products was "permitted" under the parties' contracts. During opening, Real Intent claimed that "the parties' agreements permitted" copying from PrimeTime and from Synopsys' products prior to April 2013, and published a slide with the same representation. Trial Tr. at 346:3–6. Similarly, during closing arguments, Real Intent's counsel again repeated that much of its conduct, including its use of Design Vision to ensure that its tools' outputs were consistent with those of Synopsys' tools, was "completely legal, authorized conduct under the agreements." Trial Tr. at 1742:10–13. But at no point did the Court make that finding. Synopsys explained at trial that stating certain conduct was permitted by the agreements was "prejudicial and inadmissible," but the Court ultimately declined to give a curative instruction. Trial Tr. at 1776:12–18.

## III.   LEGAL STANDARDS

Following a jury verdict, the Court may "grant a new trial on all or some of the issues … for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). These "historically recognized" grounds for a new trial "include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski*, 481 F.3d 724, 729. A new trial may also be granted where the jury's damages award was "contrary to law." *Hazle v. Crofoot*, 727 F.3d 983, 999 (9th Cir. 2013). Thus, as this Court has recognized, "the absolute absence of evidence to support the jury's verdict makes [refusal to grant a new trial] an error in law." *Cave Consulting Grp., LLC v. Optuminsight, Inc.*, No. 5:11-CV-00469-EJD, 2016 WL 4658979, at *3 (N.D. Cal. Sept. 7, 2016); *see also Alford v. Haner*, 446 F.3d 935, 936 (9th Cir. 2006) (motion for a new trial must be granted if "the record contains no evidence that can support the verdict").

It is black letter law that "[a]ttorney argument is not evidence." *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034 (Fed. Cir. 2017) (citing *Gemtron Corp. v. Saint-Gobain Corp.*, 572

1    F.3d 1371, 1380 (Fed. Cir. 2009)); *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1074

2    n.3 (N.D. Cal. 2012).  Thus, where a jury's damages award is "based entirely on the statements and

3    arguments of defendant's counsel" which otherwise lack evidentiary support, it is properly vacated.

4    *Ironworks Pats., LLC v. Apple, Inc.*, 255 F. Supp. 3d 513, 532 (D. Del. 2017).

5        Likewise, a trial may be deemed unfair to the party moving, resulting in a new trial, if

6    "opposing counsel's conduct causes prejudice" to the moving party, "thereby unfairly influencing

7    [the] verdict."  *Cones v. Cnty. of Los Angeles*, No. 14-cv-8281, 2016 WL 7438817, at *8 (C.D. Cal.

8    Sept. 28, 2016) (quoting *Tesser v. Bd. of Educ.*, 370 F.3d 314, 321 (2d Cir. 2004)).  For example,

9    where counsel makes "improper arguments" at "'critical moments' during a case," the "cumulative

10   effect of the improper statements" may warrant a new trial.  *Pavemetrics Sys., Inc. v. Tetra Tech,*

11   *Inc.*, 652 F. Supp. 3d 1098, 1104–05 (C.D. Cal. 2023) (citation omitted).

## IV.    ARGUMENT

12       The jury's lost profits award was contrary to law, unsupported by record evidence, and

13   infected by highly prejudicial arguments from Real Intent's counsel for which a curative instruction

14   was not given.  Accordingly, a new trial on the amount of lost profits Synopsys would have earned

15   but for Real Intent's breach of contract is warranted.

### A.    The Jury's Apportionment of Synopsys' Lost Profits Was Contrary to Law

18       First, a new trial is warranted because there was no basis in law for the jury, having found

19   that Synopsys lost sales as a result of Real Intent's breach of contract, to apportion those lost sales

20   by the proportion of Design Vision commands, options, and attributes that Real Intent copied in

21   breach of the in-Sync and Synopsys Loan Agreements—whether that proportion was 0.6% or

22   something else.  Indeed, by awarding lost profits, the jury determined that Real Intent had unlawfully

23   incorporated all of the command set elements at issue, both disputed and undisputed, and that this

24   was a substantial factor in causing Synopsys harm.  Put another way, the jury necessarily rejected

25   Real Intent's claim that there was no causation between their breaches of contract and Synopsys'

26   lost sales.  Under the law, that is where the inquiry ends.  Between 2017 and 2024, Synopsys lost

27   out on sales to six customers who demanded support for the Design Vision commands, and who

28   chose Real Intent because they were able to meet that demand.  Synopsys lost 100% of each of those

sales because support for the commands was a determinative factor that resulted in these six customers selecting Real Intent over Synopsys.  Synopsys did not lose *some part* of those sales: competition with Real Intent was head-to-head, and all-or-nothing.

At trial, Synopsys presented ample evidence of causation, and Synopsys incorporates by reference herein its memorandum in support of its Motion for Permanent Injunction.  (ECF 843.) To calculate damages from that evidence, its expert economist Mr. Napper identified six "very large customers" for which "there was no real competition, except for Real Intent and Synopsys."  Trial Tr. at 1066:2–19 (Napper).  He analyzed Real Intent's sales to those customers starting from 2017, "because that's when Synopsys introduced [its] VC SpyGlass product," and continuing through Real Intent's latest production of sales data—summer 2024.  Trial Tr. at 1067:2–10 (Napper).  In total, Mr. Napper concluded that approximately ████████ in sales "would have gone to Synopsys" absent Real Intent's copying.  Trial Tr. at 1079:1–5 (Napper).  And, applying Synopsys' average profit margin of ██ percent, Mr. Napper opined that Synopsys would have earned $41,462,677 in profits but-for Real Intent's breach of the parties' agreements.  Trial Tr. at 1079:6–13, 1089:2–7 (Napper).

This opinion was well-supported by the trial evidence.  Former Synopsys employee Namit Gupta—████████████████████████████████████—testified that "support for the [Design Compiler] commands was a criteria" for "[a]lmost all of the evaluations" that he was involved in during his time at Synopsys.  Trial Tr. at 968:13–969:1 (Gupta).  Indeed, Real Intent made significant inroads in 2017 and early 2018—just as Synopsys was rolling out VC SpyGlass— and was the only company offering static verification tools that supported Synopsys' proprietary command set elements at that time.  Trial Tr. at 969:14–984:10 (Gupta).  And after Real Intent won customers, it kept them; as Mr. Gupta explained, "once you lose a business, it takes a long time to win it back."  Trial Tr. at 986:2–14 (Gupta).  As a matter of law, Synopsys was entitled to all of the profits it would have earned had it, and not Real Intent, made each of the sales in question— notwithstanding how many of Synopsys' command set elements Real Intent copied to win each customer.  There is no legal basis to support any apportionment of the profits lost.

The Federal Circuit's decision in *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1283–90 (Fed. Cir. 2017), reflects the damages principles that apply to this case. There, the jury awarded the plaintiff approximately $36 million in lost profits for patent infringement, and the defendant moved to vacate the verdict, arguing that "the district court failed to apportion the lost profits" by reducing that award to account for other unclaimed features in the accused product. *Id.* at 1283. As here, the jury found that a specific customer (in that case, Intel) would not have purchased the defendant's system if it lacked certain features proprietary to the plaintiff. *Id.* at 1287. The defendant argued that the plaintiff was not entitled to all of the profits it would have made on the sale, but that further apportionment of the lost profits award was necessary "to cover only the patentee's inventive contribution." *Id.* at 1287–88. But the Federal Circuit rejected that assertion. As it found, evidence of "***demand for the [accused] product as a whole*** and the absence of non-infringing alternatives" entitled the plaintiff to recover 100% of the profits it would have made on a given sale, not some apportioned amount. *Id.* at 1287–88 (emphasis added). In so holding, the *Mentor Graphics* court recognized that a lost profits award is intended to compensate the plaintiff for all of what it would "have made (what would [its] profits have been) if the infringer had not infringed," and that this is not a patent-specific rule, but rather one common to all species of lost profits: "lost profit patent damages are no different than ***breach of contract*** or general tort damages." *Id.* at 1284 (emphasis added).

Similarly, in *Universal Electronics, Inc. v. Universal Remote Control, Inc.*, the district court recognized that where a plaintiff proves but-for causation—*i.e.*, that it would have made sales in the absence of a defendant's wrongdoing, "apportionment is not necessary in these particular market conditions." 34 F. Supp. 3d 1061, 1094 (C.D. Cal. 2014). As it noted, a defendant, may, like Real Intent, "attack Plaintiff's but-for causation proof by demonstrating that factors other than [the accused misconduct] were the but-for cause of the lost sales," but if it fails to make that showing, a plaintiff is entitled to all of the resulting lost profits. *Id.*

Here, Synopsys proved that Real Intent's breach of contract caused its lost sales. It is undisputed that Real Intent copied the most important Design Compiler commands for use in static verification; its Vice President of Engineering, Rajiv Kumar, admitted that Real Intent "copied those

commands that were most relevant to the Real Intent tools." Trial Tr. at 1498:11–1499:20 (Kumar); *cf.* TX-729-020, Trial Tr. at 949:8–950:8 (Gupta). Likewise, Real Intent's Head of Business Development, Vikas Sachdeva, admitted that customers like █████████, and ████████ asked Real Intent to incorporate Synopsys commands, and that Real Intent did so accordingly. Trial Tr. at 1388:8–1389:8 (Sachdeva). Real Intent's copying of Design Compiler commands saved customers "weeks and hours" of setup time, improving performance, shortening runtime, and reducing noise. Trial Tr. at 945:4–947:6 (Gupta); PDX7-002; Trial Tr. at 787:14–789:9 (Edwards). As noted, Synopsys showed that those factors are important to customers, and influence their decisions to buy static verification tools. *See, e.g.*, Trial Tr. at 945:4–947:6 (Gupta); Trial Tr. at 1572:2–15 (Bennis); Trial Tr. at 685:3–9 (Ma) ("In my experience, I have seen that the cross-tool consistency of products will impact customer purchasing decisions."). Under these circumstances, Real Intent did not demonstrate that "factors other" than its breach caused Synopsys to lose sales, *Univ. Elecs.*, 34 F. Supp. 3d at 1094, and Synopsys was "entitled to be made whole for the profits it prove[d] it lost." *Mentor*, 851 F.3d at 1284.

By finding that Synopsys was entitled to lost profits, the jury agreed that Real Intent's copying caused it to make sales at the expense of Synopsys. Its concomitant award of just 0.6% of Synopsys' lost profits must be vacated. It has no basis in the record and is "contrary to law," warranting a new trial as a result. *Hazle*, 727 F.3d at 999.

## B.    The Jury's Damages Award Was Supported Only by Attorney Argument, and Cannot Stand

As set forth above, the jury's lost profits award also must be vacated because it rested on an apportionment calculation that finds no support in the trial record beyond the unsupported say-so of Real Intent's counsel. Courts routinely grant a new trial where a damages award is "against the weight of the evidence." *See Molski*, 481 F.3d at 729; *see also C.R. v. PLB Mgmt. LLC*, No. 2:21-cv-03275, 2023 WL 3868353, at *10 (C.D. Cal. June 7, 2023) (conditionally granting new trial on damages where "the verdict's award [was] against the weight of the evidence, i.e., none"); *Bandary v. Delta Air Lines, Inc.*, 623 F. Supp. 3d 1071, 1077 (C.D. Cal. 2022) (granting a new trial where "the jury's $2.5 million award for bodily injury [wa]s contrary to the clear weight of the evidence");

*Antonick v. Elec. Arts Inc.*, No. 11-cv-1543, 2014 WL 245018, at *10 (N.D. Cal. Jan. 22, 2014) (conditionally granting new trial where the verdict was "against the clear weight of the evidence"); *Cave Consulting*, 2016 WL 4658979, at *3 (new trial should be granted where there is an "absolute absence of evidence to support the jury's verdict"). Indeed, the Ninth Circuit has explained that the district court has a "duty" to "set aside the verdict of the jury" if the verdict is "contrary to the clear weight of the evidence," even if the verdict is nonetheless "supported by substantial evidence." *Bandary*, 623 F. Supp. 3d at 1075 (quoting *Molski*, 481 F.3d at 729). Synopsys is entitled to that same relief here. As described above, Real Intent never substantiated that it copied 0.6% of the Design Vision commands; its only testifying expert, Ms. Bennis, provided ***an entirely different percentage*** of unlawfully copied commands. (*See* Section II, *supra*.) And, attempting to check Real Intent's work by referencing other testimony and exhibits in the trial record demonstrates that it is wholly unfounded. (*Id.*) Simply put, the path taken by the jury finds no basis in the evidentiary record, and a new trial is necessary as a result.

This case is on all fours with *Ironworks*, a patent case from the District of Delaware. There, after finding the asserted claims were infringed and not invalid, the jury awarded a reasonable royalty of 4.2 cents per unit, which was substantially lower than the 25 cents per unit sought by the plaintiff. 255 F. Supp. 3d at 530. As was the case here, the jury's verdict adopted unsupported attorney argument: during closing, defendant's counsel presented what was, ostensibly, a "synopsis of [its] per-patent licensing calculation," but it did not "present[ ] any evidence supporting its damages position." *Id.* at 530–31. Instead—just like Real Intent did—the defendant consistently argued that "the appropriate [damages] number is zero." *Compare id.* at 531 *with* Trial Tr. at 346:17–18 ("Clearly [Real Intent's copying] had no financial impact whatsoever on Synopsys.") (opening); Trial Tr. at 1584:15–25 (Bennis) (opining that "lost profits is just simply not an appropriate means by which to calculate an award"); Trial Tr. at 1733:3–5 (closing argument) ("[Synopsys] failed to prove that the handful of industry standard commands that Real Intent has in its products caused any lost profits"). As a result, the *Ironworks* defendant could point to no evidence substantiating the 4.2 cent royalty awarded by the jury. *Id.* at 531–32.

1      This merited a new trial, as the defendant's attorney argument was insufficient to sustain the

2  jury's verdict.  As the court found, "the record lack[ed] the minimum quantum of evidence to

3  support" the jury's award because it was based "entirely on the statements and arguments of

4  defendant's counsel." *Id.* at 532.  Although the defendants' counsel "may have called into question

5  plaintiff's damages amount," it did not provide a basis for that alternative award.[4]  The same is true

6  here, where the only lost profits calculation presented to the jury "was the opinion of [Mr. Napper]."

7  *Id.*

8      *Ironworks* is no outlier:  courts across the country routinely vacate jury verdicts that are

9  premised on attorney argument rather than creditable evidence.  *See, e.g.*, *Automatic Equip. Mfg.*

10  *Co. v. Danko Mfg., LLC*, 582 F. Supp. 3d 649, 662–64 (D. Neb. 2022); *Intell. Ventures I, LLC v.*

11  *Canon Inc.*, 104 F. Supp. 3d 629, 659 (D. Del. 2015); *Colucci v. Callaway Golf Co.*, 748 F. Supp.

12  2d 629, 633–36 (E.D. Tex. 2010).  For example, in *Automatic Equipment*, a patentee "presented no

13  evidence in support of its claim that the [accused product] includes the [claimed] negative pressure

14  sensor." 582 F. Supp. 3d at 654, 662–63.  Although its counsel "repeatedly stated his belief" that

15  this claim element must be present, the court vacated the jury verdict after concluding that "counsel's

16  questions are not evidence." *Id.* at 663–64 (citing *Icon Health*, 849 F.3d at 1043).

17      Similarly, in *Intellectual Ventures*, the court found no competent evidence to support a

18  verdict of non-infringement of a patent, noting that defendant's counsel "improperly played the role

19  of expert witness by inferring from factual testimony that the accused devices do not meet the claim

20  limitations." *Id.* at 659.  Because "[u]nsubstantiated attorney argument … is no substitute for

21  competent, substantiated expert testimony," the court ultimately granted a new trial on the issue of

22  infringement. *Id.* (quoting *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir.

23  2005)).

24

25

26  ─────────────────
    [4] In *Ironworks*, the court adjusted the damages award to the "lowest damages award supported by

27  sufficient evidence," *id.* at 532–33, as the plaintiff had moved for judgment as a matter of law on lost

28  profits damages.  Because Synopsys did not so move, a new trial is necessary.

1    Finally, in *Colucci*, the court set aside a jury verdict that was supported by nothing but

2    attorney argument.  748 F. Supp. 2d at 633 ("Outside of closing argument, [the plaintiff] did not

3    reference the doctrine of equivalents.").  As a result, the court held that the plaintiff "failed to provide

4    sufficient evidence to support a finding of infringement under the doctrine of equivalents," and

5    granted judgment as a matter of law of no infringement on that issue.  *Id.* at 636.

6    For the same reasons, this Court should vacate the jury's damages award because it is based

7    solely on attorney argument and finds no basis in the record evidence.  The jury's verdict is not only

8    "against the weight of the evidence," *see Molski*, 481 F.3d at 729; there is an "absolute absence of

9    evidence to support the jury's verdict," and a new trial should be granted as a result.  *See Cave*

10   *Consulting*, 2016 WL 4658979, at *3.  Failure to grant a new trial could result in the unsavory

11   precedent that unsubstantiated attorney argument *can* form the basis for a jury's verdict, contrary to

12   the weight of authority from courts across the country.

13   **C.    The Jury's Verdict Was Infected by Repeated Attorney Argument that Copying**

14   **Commands from Sources Other than Design Vision Was "Authorized" or**

15   **"Permitted" by the Contracts at Issue**

16   Separate from its inappropriate apportionment of Synopsys' lost profits, the jury's verdict

17   was also infected by repeated false and prejudicial attorney argument from Real Intent that some of

18   its copying of Synopsys proprietary command set elements was "authorized" or "permitted" under

19   the contracts at issue.  The presentation of these arguments to the jury resulted in significant

20   prejudice to Synopsys, and the trial was "not fair" to Synopsys as a result.  *See Molski*, 481 F.3d at

21   729.

22   As courts in this district have recognized, if "opposing counsel's conduct causes prejudice"

23   to the moving party, "thereby unfairly influencing [the] verdict," a new trial may be warranted.

24   *Cones*, 2016 WL 7438817, at *8; *see also Pavemetrics*, 652 F. Supp. 3d at 1104–05.  Real Intent's

25   attorney argument that the contracts "authorized" or "permitted" copying of Synopsys commands

26   was more than just "an isolated, short comment during a closing statement," but was a running theme

27   throughout the case, and the "cumulative effect of the improper statements" warrants a new trial.

28   *Pavemetrics*, 652 F. Supp. 3d at 1104–05; *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d

1292, 1319–21 (Fed. Cir. 2011) (granting new trial where prejudicial statements "inappropriately contributed" to jury's damages award).

Starting from its opening statement, Real Intent sought to present its copying as sanctioned by Synopsys.  It emphasized that "Real Intent from time to time … incorporated commands that were in Synopsys products and ***the parties' agreements permitted that.  The parties' agreements permitted that.***"  Trial Tr. at 346:3–6 (emphasis added).  Real Intent's counsel further asserted that "the contracts prohibited copying from Design Vision" after the contracts were signed, but that "what [was] permitted" included "copying from PrimeTime, copying from earlier in time, copying from any other source like a Real Intent product."  *Id.* at 358:14–17.  In fact, Real Intent underscored this argument by presenting the below demonstrative during its opening statement:



DDX1-032.

Real Intent reinforced this same theme during its presentation of evidence.  For example, its damages expert, Ms. Bennis, displayed the demonstrative reproduced below, which states that 98% of commands in Real Intent's Meridian product—*i.e.*, all commands that were not at issue in this case—were "original Real Intent commands."  Trial Tr. at 1636:12–23.



DDX6-022.[5]  Yet, Meridian undisputedly included scores of command set elements that were by no means "original" to Real Intent:  some were SDC commands set elements lawfully licensed from Synopsys; while still others were (1) copied from other Synopsys products, like PrimeTime; or (2) copied from Design Vision before the contracts became effective in 2013.[6]  Trial Tr. at 1637:14–17, 1741:21–1742:3.   Taking Real Intent's opening statement in conjunction with Ms. Bennis's testimony, Real Intent prejudicially, and falsely, characterized commands that it had copied from Synopsys without authorization as material that it was not only "permitted" to copy, but also as

---

[5] Synopsys timely objected to this slide before Ms. Bennis testified.  (*See* ECF No. 765.)

[6] Notably, Ms. Bennis was unable to reconcile her own demonstratives with these facts.  When asked whether the commands in the Real Intent products "include commands that Dr. Edwards testified were copied from Synopsys before 2013," Ms. Bennis testified that she did not "have that understanding."  Trial Tr. at 1637:18–21.  She similarly had no recollection of Mr. Kumar's testimony that Real Intent copied the "most relevant" commands from Synopsys.  *Id.* at 1638:16–1639:3.  When pressed to explain what this slide meant, Ms. Bennis explained that it was "an attempt to illustrate the disputed commands versus all of the other commands in the product," and that the 98% figure reflected all the commands except "the ones in dispute here."  *Id.* at 1637:10–17, 1637:22–1638:1.

material that was Real Intent's own "original" contribution to its products.

Finally, during its closing argument, Real Intent again told the jury that much of its conduct was "completely *legal, authorized conduct* under the agreement." Trial Tr. at 1742:11–12 (closing). Specifically, Real Intent's counsel argued that its use of Design Vision to ensure that its products would interpret commands the same way as Synopsys' tools was permitted under the contracts at issue. *Id.* at 1742:4–13 (closing) ("[Dr. Edwards] puts up testimony from Boucher and [Kowalski] and a couple of tickets…. Well, guess what? That testimony from Boucher, [Kowalski], and the tickets, that is completely legal, authorized conduct under the agreement.").

Each of these assertions was part of a false, highly misleading trial theme that merits a new trial. The in-Sync Agreements and the Synopsys Loan Agreement—the contracts at issue—set out Real Intent's rights and restrictions concerning the use of Design Vision; as the Court found at summary judgment, they provide that Real Intent may not "modify, incorporate into or with other software, or create a derivative work of any part of [Design Vision]." *See, e.g.*, TX080 § 3.2; TX082 § 2.3. In fact, the agreements expressly *prohibited* use of Design Vision "for competitive purposes"—but Real Intent sought to match its output to that of Synopsys' products for that very reason: to help it sell its products. TX080 § 3.2; TX082 § 2.3; *see* Trial Tr. at 1356:16–1357:1 (Sachdeva) ("Customer's job is to create chips, and they expect our tools to be able to read these scripts and do clock domain crossing verification, which is part of our job."); Trial Tr. at 814:18–22 (Edwards) ("[C]ustomers wanted these commands, the Synopsys commands[,] to work in Real Intent so that they -- the customers wouldn't have to rework their scripts. It would save the customers a lot of time"). And none of these contracts grant Real Intent any rights with regard to other Synopsys products like PrimeTime. Far from it: in fact, the evidence introduced at trial made clear that when Real Intent sought access and rights to PrimeTime, it was denied such access "because of competitive concerns." TX603-1; *see also* TX201-3 (observing that a Real Intent product "overlaps with some of PrimeTime's functionality").

Especially through attorney argument, Real Intent twisted the facts. Conceding—as it must—that the Court already found the contracts' restricted use of the Design Vision commands, Real Intent argued that the contracts' failure to mention other Synopsys products meant that copying

from those other sources was authorized or permitted by the contracts. This was plainly not the case, nor can it be logically. Real Intent's intended purpose in making this argument was to give the impression that copying from Synopsys was, somehow, not a big deal, or that Synopsys had separately authorized this activity. By suggesting to the jury that the contracts gave the right to copy some commands but not others, Real Intent effectively presented Synopsys' claims as arbitrary and undermined the claim by Synopsys that protecting its proprietary commands was crucial. This was highly prejudicial to Synopsys.

Synopsys repeatedly objected to these assertions, and asked the Court for a curative instruction. As it explained after opening statements, "the argument that the contracts permitted the copying" was "prejudicial and just not accurate." Trial Tr. at 386:12–16. The following morning, the Court suggested that Synopsys raise a potential curative instruction at the charging conference. Trial Tr. at 396:14–24. Consistent with the Court's suggestion, Synopsys proposed a final jury instruction directed to that issue. ECF 757 at 16 ("The contracts between Synopsys and Real Intent that are at issue in this case do not permit copying from PrimeTime, nor do they prohibit copying from PrimeTime."). But the corresponding final instruction adopted by the Court did not adopt this language. Instead, the Court instructed the jury that "[t]he contract terms at issue relate only to Design Vision. Your determination of the harm resulting from Real Intent's breach should be limited to commands/options, and attributes, with syntax, copied from Design Vision after April 2013." (ECF 797 at 14.) This instruction did not remedy the harm to Synopsys from Real Intent's repeated prejudicial misstatements.

Following the parties' closing arguments, Synopsys once again objected to Real Intent's arguments regarding what copying was "permitted." As Synopsys explained, "[t]here is no finding that the agreement allowed or permitted anything[,] so implying that some things have been expressly permitted by the contract when that is not in evidence and hasn't been ruled on by the Court is also prejudicial and inadmissible." Trial Tr. at 1776:12–18. Again, however, the Court declined to give a curative instruction as to what was "permitted" by the contract. Trial Tr. at 1780:22–1799:17.

Courts grant new trials when prejudicial evidence and argument "inappropriately contribute[]" to the jury's verdict. *See, e.g., Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1319–21 (Fed. Cir. 2011); *Pavemetrics*, 652 F. Supp. 3d at 1103–05.  For example, in *Uniloc*, the plaintiff presented evidence that the defendant's total revenues for the accused products were $19 billion, even though the damages at issue were a mere fraction of that much larger number.  652 F.3d at 1311, 1319.  As the Federal Circuit recognized, that total revenue figure "cannot help but skew the damages horizon for the jury," and the "$19 billion cat was never put back into the bag." *Id.* at 1320.  And, in *Pavemetrics*, the court found that the "cumulative effect" of improper statements by counsel merited a new trial, where it made "untrue and confusing" arguments.  652 F. Supp. 3d at 1103–04.  The court could not countenance such arguments, which "urged the jury to decide the case on irrelevant factors," and which were made at "critical moments" in the trial, "including cross-examination of key witnesses and closing."  *Id.* at 1103, 1105 (quoting *Cones*, 2016 WL 7438817, at *9).

Likewise, Real Intent's false assertion that Synopsys "permitted" Real Intent to copy some subset of its proprietary command set elements was never remedied by a curative instruction here.  Real Intent's repeated statements were more than "an isolated, short comment during a closing statement"; they were a consistent part of Real Intent's trial theme that ran from opening, through the presentation of evidence, and into closing.  *See id.*; *Cones*, 2016 WL 7438817, at *9.  In short, the cumulative effect of these arguments infected the jury with the belief that the command set elements that Real Intent copied from Design Vision lack value; they "skew[ed] the damages horizon" for the jury, and likely "inappropriately contributed" to the ultimate damages award.  *See Uniloc*, 632 F.3d at 1320.  Accordingly, a new trial should be granted, during which Synopsys can present its damages case without the improper influence of misleading and false arguments about what the parties' contracts permitted.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, the jury's verdict should be vacated and a new trial for an accounting of Synopsys' lost profits should be scheduled as soon as the Court's calendar permits.

1   Dated:  January 10, 2025                    Respectfully Submitted,

2                                               WILLKIE FARR & GALLAGHER LLP

3                                               By:     */s/ Krista S. Schwartz*

4                                                       Krista S. Schwartz
                                                        Barrington Dyer
5                                                       Joshua D. Anderson
                                                        Stephen Henrick
6                                                       Jacob Karim
                                                        Christopher J. Lee
7                                                       Shaimaa M. Hussein *(Pro Hac Vice)*
                                                        Devon W. Edwards *(Pro Hac Vice)*
8                                                       Dane Sowers *(Pro Hac Vice)*

9                                                       Attorneys for Plaintiff
                                                        SYNOPSYS, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28